[No. 29297. *En Banc.* July 22, 1944.]

SOUNDVIEW PULP COMPANY, *Respondent*, v. JACK TAYLOR, *as Commissioner of Public Lands, Appellant.*

THE STATE OF WASHINGTON *on the Relation of Coos Bay Pulp Corporation, Respondent*, v. JACK TAYLOR, *as Commissioner of Public Lands, Appellant.*

COOS BAY PULP CORPORATION, *Respondent*, v. JACK TAYLOR, *as Commissioner of Public Lands, Appellant.*[1]

[1]Reported in 150 P. (2d) 839.

The *Attorney General* and *R. A. Moen, Assistant,* for appellant.

*Bogle, Bogle & Gates* and *Robert W. Graham,* for respondent Coos Bay Pulp Corporation.

*Robert C. Finley, Stanley C. Soderland, Thomas I. Emerson, Fleming James, Jr., Abraham Glasser,* and *George H. Layman, amici curiae.*

GRADY, J.—Originally three actions were commenced against Jack Taylor, as commissioner of public lands: one by the Soundview Pulp Company, one by the state of Washington on the relation of Coos Bay Pulp Corporation, and another by the latter corporation in its own behalf. In this opinion, the parties will be referred to as Soundview, respondent, and appellant, respectively.

Soundview had been the highest bidder at a public sale of timber grown on state school lands, but was informed by the office of price administration that its bid was in excess of the ceiling price for the timber as provided under maximum price regulation 460 and that if it consummated the purchase the price administrator would hold it responsible for a violation of the emergency price control act of 1942, executive order No. 9250, and the regulation. Soundview deposited the amount of its bid with the appellant. Being unwilling to incur the risks of penalties and possible criminal actions for violation of the act and the regulation, Soundview on December 1, 1943, brought an

action against the appellant praying that he be required to refrain from paying the money deposited into the state treasury and not consummate a sale of the timber to it until the United States could be allowed to intervene in the action and the court determine whether the bid was lawful. A temporary restraining order was issued returnable at a subsequent date. The appellant demurred to the complaint. The United States did not make an appearance in the action.

On December 7, 1943, the respondent in the name of the state filed an affidavit and application for a writ of mandate to be directed to appellant commanding him to accept its bid for the timber, which bid was in a less amount than that of Soundview, but was for the maximum price fixed by the office of price administration for the timber, and consummate a sale thereof to respondent. An alternative writ was issued. Issues of law and fact were tendered by appellant by demurrer and return to the application and reply.

On December 16, 1943, respondent filed its complaint praying for the same relief as asked in its mandamus proceeding, and in addition that the court determine and declare its rights, status, and other legal relations with reference to the subject matter involved and for a permanent injunction restraining appellant from consummating a sale to Soundview of the timber in question. A temporary restraining order was issued. Issues of law and fact were tendered by appellant by demurrer and answer and reply. All parties entered into a written stipulation to consolidate the cases for trial and an order was entered accordingly.

After the conclusion of the trial, the court made a written decision and later made findings of fact, conclusions of law, and decree sustaining the validity of maximum price regulation 460, adjudging that the total of the bids of respondent was the highest lawful bid made at the sale and directing the appellant to accept the bids and consummate a sale of the timber to the respondent. The decree enjoined appellant from accepting the bids of Soundview and consummating a sale of the timber to it, and directed appellant to

return the check of Soundview deposited with him as payment for the timber.

The appellant has taken an appeal from the decree. Soundview has not appeared in this court. Permission was given by this court to the office of price administration to appear as *amicus curiae,* file a brief, and present oral argument; also, further permission was given to it to file a supplemental brief.

The material facts necessary to a decision of this case are as follows: The state of Washington is the owner in its sovereign and governmental capacity of section 36, township 36 north of range 5 E. W. M. in Skagit county, and became such pursuant to the enabling act by which it was admitted as one of the United States. On September 15, 1943, the war production board issued a "directive" to the appellant asking that the timber on the south half of section 36 be made available for sale on or before October 19, 1943. Pursuant to an application made by respondent for the appraisement and sale of the timber on the south half of section 36, the appellant caused the timber on all of the section to be appraised and gave notice that it would be sold at public auction to the highest bidder on November 23, 1943; that the sale would be made by the auditor of Skagit county at the courthouse in the city of Mount Vernon. At the time and place fixed in the notice, the auditor offered the timber on each quarter section for sale. Soundview and respondent were the only bidders. The figures we use are the collective sums for the four quarter sections. Soundview was the highest bidder. Respondent made claim that, notwithstanding the bids that had been made, the only legal maximum bid that could be made was the ceiling price fixed by the office of price administration, which was $77,853.25.

The appraised value of the timber was $60,354.50. The bid of Soundview was $86,342.39, and that of respondent $86,342.35. The auditor declared that Soundview was the highest bidder and accepted its check in the amount of its bid. Respondent tendered a check to the auditor in the sum of $77,853.25. The auditor received both checks and

sent them with his report of the sale to appellant. The appellant returned respondent's check to it, notified both bidders that Soundview was the successful bidder and that he intended to confirm a sale to Soundview.

The question to be determined by us is whether the appellant had the legal right to make a sale of the timber at a price in excess of the maximum price fixed by the office of price administration.

By the terms of the enabling act, upon the admission of Washington into the Union, sections numbered 16 and 36 in every township therein were granted to it for the support of common schools and it was provided that all lands thereby granted for educational purposes should be disposed of only at public sale and at a price not less than ten dollars per acre, the proceeds to constitute a permanent school fund, the interest of which only should be expended in the support of such schools.

By § 2 of Art. XVI of the state constitution, it is provided that "None of the lands granted to the state for educational purposes shall be sold otherwise than at public auction to the highest bidder; and the value thereof, less the improvements, shall, before any sale, be appraised by a board of appraisers, to be provided by law, the terms of payment also to be prescribed by law, and no sale shall be valid unless the sum bid be equal to the appraised value of said land. . . ."

By § 3, it is provided that the timber off any of the state lands may be sold in such manner and on such terms as may be prescribed by law. By legislative enactment the procedure for the sale of the land or the timber separate therefrom is prescribed.

On or about January 30, 1942, the emergency price control act of 1942 became effective. (56 Stat. 23, 50 U. S. C. A. (Sup.), § 901 and subsequent sections.) Its territorial field of operation covers the United States, its territories and possessions, and the District of Columbia. Its stated purpose is in general as follows:

" . . . to stabilize prices and to prevent speculative, unwarranted, and abnormal increases in prices and rents;

to eliminate and prevent profiteering, hoarding, manipulation, speculation, and other disruptive practices resulting from abnormal market conditions or scarcities caused by or contributing to the national emergency; to assure that defense appropriations are not dissipated by excessive prices; to protect persons with relatively fixed and limited incomes, consumers, wage earners, investors, and persons dependent on life insurance, annuities, and pensions, from undue impairment of their standard of living; to prevent hardships to persons engaged in business, to schools, universities, and other institutions, and to the Federal, State, and local governments, which would result from abnormal increases in prices; . . ."

The office of price administration is created and is given broad powers in determining at what prices commodities shall be bought and sold. An emergency court of appeals is created and it is given exclusive jurisdiction to determine the validity of any regulation or order that may be issued pursuant to the act. The price administrator is directed that, whenever in his judgment the price of a commodity has risen or threatens to rise to an extent inconsistent with the purposes of the act, he may by regulation or order establish such maximum prices as in his judgment will be generally fair and equitable and will effectuate the purposes of the act.

He must make adjustments for such relevant factors as he may determine and deem to be of general applicability, including speculative fluctuations, general increases or decreases in costs of production, distribution, and transportation, and general increases or decreases in profits earned by sellers of the commodity during and subsequent to the year ended October 1, 1941. Before issuing any regulation or order, he is required, so far as practicable, to advise and consult with representative members of the industry which will be affected by such regulation or order. If after a maximum price has been established a substantial portion of the industry affected requests it, the administrator must appoint an industry advisory committee of such number as to be truly representative of the industry and from time to time at its request advise and consult with it with respect

to the regulation or order, the form thereof, and classifications, differentiations, and adjustments therein.

The act is not to be construed as affecting the use of trade and brand names or as authorizing the administrator to require the grade labeling of any commodity or to standardize it, unless no practicable alternative exists to secure effective price control thereof, or as authorizing any order fixing maximum prices for different kinds, classes, or types of a commodity which are described in terms of specifications or standards, with certain exceptions not material. Nothing in the act is to be construed to require any person to sell any commodity.

The respondent contends that the courts of this state are without jurisdiction to determine the validity of the order of the administrator, because of the exclusive jurisdiction given to the emergency court of appeals created by the act, but, as pointed out by the attorney general, this question is only incidentally involved. We find it unnecessary to pass upon either the constitutionality of the act as applied to the state of Washington or our right to consider the validity of the order, as we think the act is open to construction as to whether it applies to the situation we have before us.

In defining the term "person," § 942 (h) of the act provides that it shall include "an individual, corporation, partnership, association, or any other organized group of persons, or legal successor or representative of any of the foregoing, and includes the United States or any agency thereof, or any other government, or any of its political subdivisions, or any agency of any of the foregoing: . . ." If the state of Washington is covered by the act it is because of the words "or any other government."

■ We have adopted the rule that, " 'Where the language of a statute is transparent, and its meaning clear, there is no room for the office of construction. There should be no construction where there is nothing to construe.' " *Smith v. Department of Labor & Industries,* 8 Wn. (2d) 587, 593, 113 P. (2d) 57. See *Ernst v. Kootros,* 196 Wash. 138, 82 P. (2d) 126; *Shelton Hotel Co. v. Bates,* 4 Wn. (2d) 498, 104 P. (2d) 478.

■ There are statutes, however, in which their wording may be plain, but it may appear from such wording that a given statute may be applied in different ways, or some of the words may be susceptible of different meanings, and if applied, or the words are used in a certain way, the statute would be unconstitutional, or a grave doubt as to its validity would be raised. In such cases the rule is that, where a statute is open to two constructions, one of which will render it constitutional and the other unconstitutional or open to grave doubt in this respect, the former construction and not the latter is to be adopted. *State ex rel. Campbell v. Case,* 182 Wash. 334, 47 P. (2d) 24; *State ex rel. Dept. of Finance, Budget and Business v. Thurston County,* 199 Wash. 398, 92 P. (2d) 234.

In *United States v. Standard Brewery,* 251 U. S. 210, 64 L. Ed. 229, 40 S. Ct. 139, it is stated, p. 220:

"Furthermore, we must remember in considering an act of Congress that a construction which might render it unconstitutional is to be avoided. We said in *United States v. Jin Fuey Moy,* 241 U. S. 394, 401: 'A statute must be construed, if fairly possible, so as to avoid not only the conclusion that it is unconstitutional but also grave doubts upon that score.' "

This rule has been followed in *United States v. LaFranca,* 282 U. S. 568, 75 L. Ed. 551, 51 S. Ct. 278, and *United States v. Shreveport Grain & Elevator Co.,* 287 U. S. 77, 77 L. Ed. 175, 53 S. Ct. 42.

We think the latter rule is applicable here. The whole history of congressional legislation and its interpretation by the United States supreme court indicates a studied effort to avoid encroachments upon the rights and prerogatives of the several states, especially with reference to their governmental functions, and to limit the application of the legislation to the citizen, or if applicable to the state at all, then only with reference to its proprietary status. *South Carolina v. United States,* 199 U. S. 437, 50 L. Ed. 261, 26 S. Ct. 110; *Metcalf & Eddy v. Mitchell,* 269 U. S. 514, 70 L. Ed. 384, 46 S. Ct. 172; *Florida v. United States,* 282 U. S. 194, 75 L. Ed. 291, 51 S. Ct. 119.

In the *South Carolina* case, it is said, p. 448:

"We pass, therefore, to the vital question in the case, and it is one of far-reaching significance. We have in this Republic a dual system of government, National and state, each operating within the same territory and upon the same persons; and yet working without collision, because their functions are different. There are certain matters over which the National Government has absolute control and no action of the State can interfere therewith, and there are others in which the State is supreme, and in respect to them the National Government is powerless. To preserve the even balance between these two governments and hold each in its separate sphere is the peculiar duty of all courts, preeminently of this—a duty oftentimes of great delicacy and difficulty."

In the *Metcalf* case, p. 523:

"But neither government may destroy the other nor curtail in any substantial manner the exercise of its powers. Hence the limitation upon the taxing power of each, so far as it affects the other, must receive a practical construction which permits both to function with the minimum of interference each with the other; and that limitation cannot be so varied or extended as seriously to impair either the taxing power of the government imposing the tax [citing authorities] or the appropriate exercise of the functions of the government affected by it."

And in *Florida v. United States,* p. 211:

"The question in the present cases, then, is not one of authority, but of its appropriate exercise. The propriety of the exertion of the authority must be tested by its relation to the purpose of the grant and with suitable regard to the principle that whenever the federal power is exerted within what would otherwise be the domain of state power, the justification of the exercise of the federal power must clearly appear."

A very clear and concise statement appears in 11 Am. Jur., Constitutional Law, p. 870, § 174:

"Among the matters which are implied in the Federal Constitution, although not expressed therein, is that the National Government may not, in the exercise of its powers, prevent a state from discharging its ordinary functions of government. This corresponds to the prohibition that no

state can interfere with the free and unembarrassed exercise by the Federal Government of all powers conferred upon it. In other words, the two governments, national and state, are each to exercise its powers so as not to interfere with the free and full exercise of the powers of the other. Therefore, whenever the Federal power is exerted within what would otherwise be the domain of state power, the justification of the exercise of the Federal power must clearly appear."

■ With the foregoing as a preface, we must look to the act itself and consider the status of the timber upon which the price has been fixed in aid of a determination as to whether it can be said that Congress intended the act should apply to the state of Washington.

It will be observed from a critical reading of the act that it relates primarily to those who buy and sell in the ordinary course of business those articles or commodities that are the ordinary subjects of sale and purchase, and also that the administrator in determining a proper price must consider certain commercial factors and consult those engaged in industry. The state of Washington in its ownership of granted school lands does not fall within this category. It owns and holds them in its sovereign, as distinguished from its proprietary, capacity, and in aid of the performance of its governmental function of education. Any sale of such lands or of the timber apart from the land is not a commercial transaction, but is an exercise of one of its governmental prerogatives to secure funds to carry on its governmental function of educating its people through its common schools. If it were the intention of Congress that the act should apply to the state in its sovereign and governmental capacity, then a grave constitutional question would exist, even though the act is a war measure.

It is universally recognized that, under the war powers given to it by the constitution, Congress may enact all needful laws in aid of the successful prosecution of a war. So broad are its powers in this respect that no attempt has been made to define any limitation thereof, but in *Hamilton v.*

*Kentucky Distilleries Co.,* 251 U. S. 146, 64 L. Ed. 194, 40 S. Ct. 106, it is said, p. 156:

"The war power of the United States, like its other powers and like the police power of the States, is subject to applicable constitutional limitations. . . ."

This authority was cited in the recent case of *Bowles v. Willingham,* 321 U. S. 503, 88 L. Ed. 626, 64 S. Ct. 641, and it was said, p. 521:

"We fully recognize, as did the Court in *Home Bldg. & Loan Assn. v. Blaisdell,* 290 U. S. 398, 426, that 'even the war power does not remove constitutional limitations safe-guarding essential liberties.' "

It would therefore seem that it may be said that a grave doubt exists as to whether Congress, in enacting a war measure relating to the fixing of prices at which commodities may be sold, has the power to make it applicable to a state with reference to property it owns and holds for the purpose of carrying on its governmental functions.

The act does not clearly and specifically grant to the administrator the power to fix prices for timber grown on state school lands, nor does it clearly and specifically include in the definition of the word "person" a state in its governmental capacity, and in construing the act the courts should not extend it to so provide. We think this is a proper deduction to be made and that it is but stating the converse of what was said by the court in *United States v. Montana,* 134 F. (2d) 194 (certiorari denied, 319 U. S. 772, 87 L. Ed. 1720, 63 S. Ct. 1438), with reference to the enabling act, p. 196:

"The language of the enabling act prohibits the state from disposing of school lands except at public sale after advertising. Since it does not clearly and specifically prohibit the United States from condemning the lands, we should not extend the prohibition to the United States."

This embodies the idea we have heretofore referred to that in enacting legislation Congress avoids so far as is possible anything that may bring national and state sovereignty into conflict.

In the cases cited by respondent, it appears that the property involved was owned by the state or other public body in a proprietary capacity. In *California v. United States,* 320 U. S. 577, 88 L. Ed. 255, 64 S. Ct. 352 *(City of Oakland v. Same),* California and Oakland had stepped aside from their governmental functions and had gone into competition with private industry in providing facilities for use by water borne traffic, and it was held that they were subject to orders made by the maritime commission. In the case from the district court of Idaho cited in the respondent's brief, a county owned a tractor which it sold at public auction, and it was held by that court that an office of price administration regulation applied. The ruling was apparently based upon the theory that the county owned the tractor in its proprietary capacity and was amenable to the act.

We are satisfied upon a consideration of the wording of the act, the course of conduct required of the administrator in fixing prices, the status of granted state school lands, and the relationship that exists between national and state sovereignties, that Congress in enacting the emergency price control act did not intend that it should apply to a state in respect to property owned in its governmental capacity. It therefore follows that, in selling timber grown on state school lands, the commissioner of public lands must do so in accordance with the enabling act and the constitution and statutes of the state of Washington, irrespective of any order or regulation of the office of price administration.

If the United States requires the timber in question in aid of its war efforts, it has the power to secure it by eminent domain proceedings, which are direct and summary. *Oklahoma ex rel. Phillips v. Guy F. Atkinson Co.,* 313 U. S. 508, 85 L. Ed. 1487, 61 S. Ct. 1050; *United States v. Montana, supra.* By this method the power of the Federal government would be exercised in a constitutional manner, and the state would receive just compensation for its timber arrived at by a competent tribunal as contemplated by the constitution.

The other questions raised and discussed in the briefs and oral arguments are incidental to those upon which we have

based our decision and need not be further considered, and, in view of the disposition we have made of the application for a writ of mandamus, it is unnecessary that any declaratory judgment be made.

The judgment is reversed and the case remanded to the lower court, with instruction to dismiss the actions brought by the respondent.

SIMPSON, C. J., BEALS, and JEFFERS, JJ., concur.

MILLARD, J. (concurring in the result)—It is *petitio principii* to invoke rule of ambiguity. Congress clearly intended to include the sovereign states within the purview of the enactment. Doing so, Congress unconstitutionally acted; therefore, we may disregard the statute. Congress cannot constitutionally invest the OPA or any other tribunal with powers claimed by that bureau. Though at war, let us hold as securely as we may the constitutional safeguards. The Federal government's encroachment on state sovereignty should be challenged.

BLAKE, J. (dissenting)—I presume that no one would deny that the delegation by the states to Congress of the power to declare war carries with it the delegation of the power to wage war effectively. That the emergency price control act of 1942 is a war measure enacted by Congress pursuant to this power delegated by the states, cannot be doubted in the light of what was announced by Mr. Justice Sutherland, speaking for the court in *United States v. Macintosh,* 283 U. S. 605, 622, 75 L. Ed. 1302, 51 S. Ct. 570:

"From its very nature, the war power, when necessity calls for its exercise, tolerates no qualifications or limitations, unless found in the Constitution or in applicable principles of international law. In the words of John Quincy Adams,—'This power is tremendous; it is strictly constitutional; but it breaks down every barrier so anxiously erected for the protection of liberty, property and of life.' To the end that war may not result in defeat, freedom of speech may, by act of Congress, be curtailed or denied so that the morale of the people and the spirit of the army may not be broken by seditious utterances; freedom of the press cur-

tailed to preserve our military plans and movements from the knowledge of the enemy; deserters and spies put to death without indictment or trial by jury; ships and supplies requisitioned; property of alien enemies, theretofore under the protection of the Constitution, seized without process and converted to the public use without compensation and without due process of law in the ordinary sense of that term; *prices of food and other necessities of life fixed* or regulated; railways taken over and operated by the government; and other drastic powers, wholly inadmissible in time of peace, exercised to meet the emergencies of war." (Italics mine.)

Being a war measure, the emergency price control act of 1942 is the supreme law of the land, before which state constitutions and state laws must bow under the express provisions of Art. VI of the Federal constitution, which, so far as pertinent, provides:

"This constitution, and the laws of the United States which shall be made in pursuance thereof, . . . shall be the supreme law of the land; *and the judges in every state shall be bound thereby, anything in the constitution or laws of any state to the contrary notwithstanding.*" (Italics mine.)

Of the supremacy accorded acts of Congress under Art. VI, Mr. Chief Justice Marshall, in *Gibbons v. Ogden,* 9 Wheat. (22 U. S.) 1, 6 L. Ed. 23, said, p. 209:

"Since, however, in exercising the power of regulating their own purely internal affairs, whether of trading or police, the states may sometimes enact laws, the validity of which depends on their interfering with and being contrary to, an act of congress passed in pursuance of the constitution, the court will enter upon the inquiry, whether the laws of New York, as expounded by the highest tribunal of that state, have, in their application to this case, come into collision with an act of congress, and deprived a citizen of a right to which that act entitles him. Should this collision exist, it will be immaterial whether those laws were passed in virtue of a concurrent power 'to regulate commerce with foreign nations and among the several states,' or, in virtue of a power to regulate their domestic trade and police. In one case and the other, the acts of New York must yield to the law of congress; and the decision sustaining the privilege they confer, against a right given by a law

of the Union, must be erroneous. This opinion has been frequently expressed in this court, and is founded, as well on the nature of the government, as on the words of the constitution. In argument, however, it has been contended, that if a law passed by a state, *in the exercise of its acknowledged sovereignty,* comes into conflict with a law passed by congress in pursuance of the constitution, they affect the subject, and each other, like equal opposing powers. But the framers of our constitution foresaw this state of things, and provided for it, by declaring the supremacy not only of itself, *but of the laws made in pursuance of it.*

"The nullity of any act, inconsistent with the constitution, is produced by the declaration, that the constitution is the supreme law. The appropriate application of that part of the clause which confers the same supremacy on laws and treaties, is to such acts of the state legislatures as do not transcend their powers, but though enacted in the execution of acknowledged state powers, interfere with, or are contrary to, the laws of congress, made in pursuance of the constitution, or some treaty made under the authority of the United States. In every such case, the act of congress, or the treaty, is supreme; *and the law of the state, though enacted in the exercise of powers not controverted, must yield to it.*" (Italics mine.)

Now, by § 204 subd. (d) of the act, in order to insure uniformity and equality in the application and administration of the act, Congress set up an emergency court of appeals, with "exclusive jurisdiction to determine the validity of any regulation or order issued under section 2, of any price schedule effective in accordance with the provisions of section 206, and of any provision of any such regulation. . . ." Further to insure uniformity and equality in administration and application of the act and regulations made under it, the same section, subd. (d), further provides:

*"Except as provided in this section, no court, Federal, State, or Territorial, shall have jurisdiction or power to consider the validity of any such regulation, order, or price schedule,* or to stay, restrain, enjoin, or set aside, in whole or in part, any provision of this Act authorizing the issuance of such regulations or orders, or making effective any such price schedule, or any provision of any such regulation, order, or price schedule, or to restrain or enjoin the enforcement of any such provision." (Italics mine.)

Now, this act, pursuant, as it is, to the power to declare and wage war delegated by the states to Congress, is the supreme law of the land—"anything in the constitution or laws of [this] state to the contrary notwithstanding." So, if the scope of the emergency price control act includes state governments, the appellant and the respondents are equally bound to abide by the order made by the price administrator fixing a ceiling price on timber sold separately from the land.

That a state government comes within the purview of the act, is manifest by the definition of "person" contained in § 302 (h) (U. S. C. A. (Sup.), § 942 (h)). If state governments are not included within the term "any other government," then no political subdivision of any state nor any state agency comes within the purview of the act, for, obviously, the political subdivisions and agencies "of the foregoing" are such as are set up and included within "any other government" within the scope of the act.

To say that the act permits of the fixing of a ceiling price on state timber, does not mean that the state *must* sell at such price. The order fixing the ceiling price does not so provide. Nor does the act authorize any such procedure. Of course, neither the state nor a private individual can be forced to part with its or his property except under the power of eminent domain. But Congress, in mobilizing the nation's economy, in furtherance of effective prosecution of the war, can say to the state and to its citizens that property shall not be bought or sold above a fixed price.

While it may be beside the issues presented to say so, I think it is apparent that the emergency price control act and the regulations made pursuant to it are part of the attempt of Congress to put war economy, so far as possible, on a "pay as you go" basis, for every rise in price in materials adds to the cost of the war and increases the national debt, the burden of paying which will largely fall on those who are doing the fighting.

Whether the order fixing a ceiling price on timber is arbitrary or unreasonable, is not for this court to say. Congress, in the valid exercise of a delegated power, has com-

mitted that question to the emergency court of appeals for determination. It is my view that all these actions should be dismissed—the declaratory judgment actions because this court is without jurisdiction to decide the issues presented, and the mandamus action because the appellant is not bound to sell state timber at the ceiling price.

STEINERT, J.— (dissenting)—I think that the judgment of the trial court should be affirmed specifically upon the grounds that, in adopting the emergency price control act (56 Stat. 23, 50 U. S. C. A. (Sup.), § 901 *et seq.*), the Congress clearly, properly, and rightly exercised its constitutional power and authority to prescribe commodity prices, *as a war emergency measure,* and that the act is to be regarded strictly as such a measure.

ROBINSON, J., concurs with STEINERT, J.

MALLERY, J. (concurring in the result)—I think that Congress included the sovereign states within the purview of the act and that as a war measure it had the power to do so. It did not attempt to repeal, amend, or suspend the state law prescribing the method of selling state timber. This results in an impasse. The land commissioner cannot sell state timber at a price above the ceiling. If there are two or more bids at the ceiling price or higher, he cannot sell at all, because the state law requiring that sales be made only to the highest bidder precludes any other method of ascertaining a successful bidder. This ties the commissioner's hands and freezes the timber. The Federal government alone has the choice of going forward by removing the ceiling prices or exercising its right of eminent domain.

In any event, mandamus will not lie to compel the land commissioner to make a sale in violation of law.