No. 7194. February 19, 1945.)

TWIN FALLS COUNTY, a political subdivision of the State of Idaho, Appellant, v. WILLIAM C. HULBERT, Respondent, CHESTER BOWLES, Administrator, Office of Price Administration, Intervenor-Respondent.

[156 Pac. (2d) 319.]

130

Everett M. Sweeley for appellant.

A. J. Myers for respondent.

Lawrence Quinn for intervenor-respondent.

GIVENS, J.—Appellant duly and regularly offered for sale at public auction under complete compliance with sec. 30-708, I.C.A.[1], a used farm-type gasoline tractor, discarded by the noxious weed department (22-1705, I.C.A.). Respondent Hulbert's bid of $1,050.00 was the highest, and therefore accepted. Before bidding Hulbert and appellant were advised by representatives of the Office of Price Administration, contrary to the opinion of the prosecuting attorney of appellant County, that the Emergency Price Control Act of 1942, Act. Jan. 30, 1942, c. 26, 56 Stat. 23, Title 50 U.S.C.A., sec. 901 et seq.,[2] applied, and after the auction that the price bid was above that set by the Admin-

[1]"To sell or offer for sale at public auction at the courthouse door, after thirty days' previous notice given by publication in a newspaper of the county any property, real or personal, belonging to the county, not necessary for its use, and such sale of real property may be made by the board of county commissioners, either for cash or upon such terms as the board of county commissioners may determine, and the same must be sold to the highest bidder. The proceeds from such sales shall be paid into the county treasury for the use of the county, unless such property has been acquired by tax deed, in which event the proceeds from such sale shall be prorated to the taxing districts in which the property is situated in proportion of each tax for the year of delinquency upon which the tax deed was issued to the county. * * *"

[2] Section 901 Purposes; time limit; applicability.

"(a) It is hereby declared to be in the interest of the national defense and security and necessary to the effective prosecution of the present war, and the purposes of this Act are, to stabilize prices and to prevent speculative, unwarranted, and abnormal increases in prices and rents; to eliminate and prevent profiteering, hoarding, manipulation, speculation, and other disruptive practices resulting from abnormal market conditions or scarcities caused by or contributing to the national emergency; to assure that defense appropriations

istrator, (Maximum Price Regulation No. 133 (F.R. 3185) issued April 28, 1942, effective May 11, 1942), therefore illegal, threatening prosecution if the sale were completed, whereupon and whereby Hulbert desisted. Appellant then brought suit against Respondent Hulbert in the State District Court to compel compliance with his bid. Hulbert's answer stated he was willing to complete his bid by the payment of any legal amount, justified his refusal to proceed further by the Price Administration activities, and praying for general relief, asked for dismissal of appellant's complaint.

Complaint in intervention was filed by Respondent Administrator, asserting the sale could not legally be consummated for more than $723.56, the maximum price fixed, and prayed, "That it be adjudged and decreed that the plaintiff herein is subject to and governed by the provisions of the Emergency Price Control Act of 1942, as amended and the provisions of Maximum Price Regulation No. 133, as amended; that it be further adjudged and decreed that the provisions of the Idaho Statutes relative to the sale of County property, in so far as they are in conflict with the above Act and Regulation, are superseded thereby; for an

are not dissipated by excessive prices; to protect persons with relatively fixed and limited income, consumers, wage earners, investors, and persons dependent on life insurance, annuities, and pensions, from undue impairment of their standard of living; to prevent hardships to persons engaged in business, to schools, universities, and other institutions, and to the Federal, State, and local governments, which would result from abnormal increases in prices; to assist in securing adequate production of commodities and facilities; to prevent a post emergency collapse of values; to stabilize agricultural prices in the manner provided in section 3 [section 903 of this Appendix]; and to permit voluntary cooperation between the Government and producers, processors, and others to accomplish the aforesaid purposes. It shall be the policy of those departments and agencies of the Government dealing with wages (including the Department of Labor and its various bureaus, the War Department, the Navy Department, the War Production Board, the National Labor Relations Board, the National Mediation Board, the National War Labor Board, and others heretofore and hereafter created), within the limits of their authority and jurisdiction, to work toward a stabilization of prices, fair and equitable wages, and cost of production.
 "(b) * * *

order enforcing compliance with the provisions of section 4 (a) of said Act; that it be further adjudged and decreed that the sum of $723.56 is the maximum price for which said tractor may be sold; and, for such other, further or different relief as to the Court may seem meet and equitable."

The learned trial court held the OPA statute constitutionally applied to the County and consequently the maximum price as fixed by Intervenor Administrator was controlling, in effect, concluding: that the plaintiff's election to prosecute this action, affirmed the sale at the maximum ceiling price, the bid in excess thereof being illegal and void.

By appropriate assignments of error, appellant raises three initial questions: (1) That the Federal Statute does not by its terms and was not intended by Congress to apply to the States of the Union or their political subdivisions, therefore, not to appellant County; (2) that if it be

"(c) The provisions of this Act shall be applicable to the United States, its Territories and possessions, and the District of Columbia. January 30, 1942, c. 26, Title I, Section 1, 56 Stat. 23, as amended October 2, 1942, c. 578, Section 7(a), 56 Stat. 767; June 30, 1944, c. 325, Title I, Section 101, 58 Stat. 632."

Section 904 (a) "It shall be unlawful, regardless of any contract, agreement, lease, or other obligation heretofore, or hereafter entered into, for any person to sell or deliver any commodity, or in the course of trade or business to buy or receive any commodity, or to demand or receive any rent for any defense-area housing accommodations, or otherwise to do or omit to do any act, in violation of any regulation or order under section 2 [section 902 of this Appendix], or of any price schedule effective in accordance with the provisions of section 206 [section 926 of this Appendix], or of any regulation, order, or requirement under section 202(b) or section 205(f) [sections 922(b) or 925(f) of this Appendix], or to offer, solicit, attempt, or agree to do any of the foregoing."

Section 942 (h) "The term 'person' includes an individual, corporation, partnership, association, or any other organized group of persons, or legal successor or representative of any of the foregoing, and includes the United States or any agency thereof, or any other government, or any of its political subdivisions, or any agency of any of the foregoing: *Provided,* That no punishment provided by this Act shall apply to the United States, or to any such government, political subdivision, or agency."

considered that the statute by its terms and provisions does and was intended to apply to the States and Counties, it is unconstitutional as an invasion of state sovereignty, violative of the 9th and 10th Federal Amendments of the Federal Constitution[3] and Section 19, Idaho Admission Bill[4]; and (3) that the court had no right to compel the County to accept the lesser amount, since the only voluntary action on the part of the County was to pursue the amount of the bid. As subsidiary to the second assignment, appellant urges that the ownership, use and disposal of the tractor by the County were the exercise of governmental, not proprietary functions.

Appellant did not attack the ceiling price fixed by the Administrator, under Section 923(a), U.S.C.A., so Intervenor makes no contention this action should have been before the Emergency Court of Appeals set up by Section 924(c), U.S.C.A., or that the State District Court did not have jurisdiction of the instant action.

Appellant concedes the Federal Statute is constitutional in general, only unconstitutional if attempted to be applied to it, presenting the issue based on this phase in its brief, thus:

"* * * The question of whether the Emergency Price Control Act is to be construed as applying to the several states of the Union and if it be held so to apply, whether such holding makes the Act violative of the Constitution of the United States, is before the Court.

"If Congress had intended to include the several states of the Union within the scope of the Emergency Price Control Act it surely would have used somewhere in the Act

---

[3] AMENDMENT IX. "Rights retained by people.—The enumeration in the constitution, of certain rights, shall not be construed to deny or disparage others retained by the people."

AMENDMENT X. "Rights reserved to states or people.—The powers not delegated to the United States by the constitution, nor prohibited by it to the states, are reserved to the states respectively, or to the people."

[4] "That from and after the admission of said State into the Union, in pursuance of this Act, the laws of the United States not locally inapplicable shall have the same force and effect within the said State as elsewhere within the United States."

the one word which to all of the Courts and to every citizen of the United States of America means one of the individual members of the United States. Its failure to use this word is not to be taken as a mere oversight but is the natural and logical result flowing from the established status of the constitutional law marking separate fields of action of the individual states on the one hand and the federal government on the other hand. By omitting the word 'state' and thereby excluding the individual members of the Union from the scope of the Price Control Act, Congress did not invade the sovereignty of the states. That field has been long established and is well defined, as Congress is presumed to have known."

Intervenor counters with these apothegms and hypotheses: The failure of Congress to use the word "states" is of no significance since Congress may use any language it chooses if unambiguous; that "government" includes states; contemporaneous administrative construction is controlling; the over-all purpose of the statute demands inclusion of the states; and it has been so construed by subordinate courts; and that Congress must be deemed to have used words and phrases in their ordinary and accepted sense.

The clash arises by reason of the existence of the dual sovereignties, which comprise our federal system, and the necessity of recognizing and heeding the line of demarcation which must be drawn between them and the avoidance of questioned, if not questionable and doubtful, constitutional hazards, which portend if the statute be held to apply to the states, their political subdivisions and their functions, governmental or proprietary. (*Soundview Pulp Co. v. Taylor, Commissioner of Public Lands of Washington*, (Wash.), 150 P. (2d) 839.)

The impact is between the imputed superiority of the Federal Statute and state statutory actions as to its own affairs not the regulation of one of its citizens.

"* * * And so we have one of those problems in the reading of a statute wherein meaning is sought to be derived not from specific language but by fashioning a mosaic of significance out of the innuendoes of disjointed bits of a statute. At best this is subtle business, calling for great wariness lest what professes to be mere rendering becomes

creation and attempted interpretation of legislation becomes legislation itself. Especially is wariness enjoined when the problem of construction implicates one of the recurring phases of our federalism and involves striking a balance between national and state authority in one of the most sensitive areas of government." (*Palmer v. Massachusetts,* 84 L. ed. 93 at 97, 308 U.S. 79, 60 S. Ct. 34.)

■ Appellant is an arm of a subordinate but not dependent sovereignty in the role of seller. The situation with regard to the Federal Government, the state or any other as purchasers, being affected by state or governmental regulation of a concededly covered seller rests upon different considerations adverted to and delineated in *Penn Dairies v. Milk Control Commission,* 87 L. ed. 748 at 756, 318 U.S. 261, 63 S. Ct. 617. Such transactions are not involved here. However, the above case is authority applicable herein to this extent that "* * * An unexpressed purpose of Congress to set aside statutes of the states regulating their internal affairs is not to be lightly inferred, and ought not to be implied where the legislative command, read in the light of its history, remains ambiguous. Considerations which lead us not to favor repeal of statutes by implication, (citing cases), should be at least as persuasive when the question is one of the nullification of state power by Congressional legislation."

■ Undoubtedly Congress may choose and employ such language as it desires, but when it departs from that which usually clearly and unequivocally designates the "states", it becomes a matter for judicial determination of what was meant and intended by such different phraseology.

"* * * The interpretation of the meaning of statutes as applied to justiciable controversies is exclusively a judicial function. * * * Obviously there is danger that the court's conclusion as to legislative purpose will be unconsciously influenced by the judges' own views or by factors not considered by the enacting body. * * * Emphasis should be laid too upon the necessity for appraisal of the purposes as a whole of Congress in analyzing the meaning of clauses or sections of general acts. A few words of general connotation appearing in the text of statutes *should not be given a wide meaning,* (emphasis ours), contrary to a settled policy 'excepting as a different purpose is plainly shown,' "

and preceding, "There is, of course, no more persuasive evidence of the purpose of a statute than the words, by which the legislature undertook to give expression to its wishes. * * *" (*United States v. American Trucking Association*, 84 L .ed. 1345 at 1351-1350, 310 U.S. 534, 60 S. Ct. 1059.)

"* * * Decision is not to be reached by a strict construction of the words of the Act nor by the application of artificial canons of construction. On the contrary, we are to read the statutory language in its ordinary and natural sense and if doubts remain, resolve them in the light, not only of the policy intended to be served by the enactment but as well by all other available aids to construction. But it is not our (court's) function to ingraft on a statute additions which we think the legislature logically might or should have made." (*United States v. Cooper Corp.*, 85 L. ed. 1071 at 1075, 312 U.S. 600, 61 S. Ct. 742.)

▇ Certainly what might be called the classical designation, to clearly indicate the "states" as individual governmental entities making up the United Nation, dating from the Constitution[5] and coming down through various acts of Congress and pronouncements of the courts, is the word "states". It is conspicuous by its absence herein.

▇ While the word "government" is of broad significance, "any other government" in the defining section, in contra distinction to the "United States" as an entity, has not in common parlance or in general usage by Congress or the courts, or otherwise, been used to denote the constituent states of the Union, but has by common acceptation clearly referred to other international governments on a governmental and sovereign parity with the United States as a nation.

"All the rights of the states as independent Nations were surrendered to the United States. The States are not Nations either as between themselves or towards foreign Nations. They are sovereign within their spheres, but their sovereignty stops short of nationality. Their political *status* at home and abroad is that of states in the United States. * * *" (*New Hampshire v. Louisiana and New*

[5]Article 1, Sections 2, 3, 4, and 10; Article 3, Section 2; Article 4, Section 4; Amendments 10, 11, 12, 14, 15, 16, 17, 18, and 19.

*York v. Louisiana*, 27 L. ed. 656 at 661-662, 108 U.S. 76, 2 S. Ct. 176.)

■ The states, not governments, are in contra distinction to the United States. (*McLauglin v. Poucher* (Conn.), 17 A. (2d) 767 at 770.)

■ "Other" in a statute means of like kind and character. (*Tapedo v. State* (Okla.), 245 P. 897 at 900; *Climax Dairy Co. v. Mulder* (Colo.), 242 P. 666 at 669; *City of Tulsa v. Clark* (Okla.), 249 P. 286 at 288; *Ex parte Carson*, (Okla.), 243 P. 260 at 262; *Gaustad v. Nygaard* (N.D.), 256 N.W. 230; *In re Bush Terminal Co.* (2d) C.C.A.), 93 F. (2d) 659 at 660; *Wiggins v. State* (Ind.), 87 N.E. 718; *Exparte Amos* (Fla.), 112 So. 289 at 290.)

■ Though specific words and phrases are to be harmonized to develop a well-rounded and effective statutory structure, ejusdem generis is not to be disregarded.[6]

■ The authorities show without cavil that there exists no misunderstanding when court or legislature makes use of the word "state" to denote one of the members of our Federal Union. (*Texas v. White*, 19 L. ed. 227 at 236, 74 U.S. 700, 19 S. Ct. 227.)

"* * * One argument of the plaintiff's counsel in this connection is, that the District of Columbia is a separate State, or sovereignty, according to the definition of writers on public law, being a distinct political society. * * * The court did not deny that the District of Columbia is a State in the sense of being a distinct political community; but held that the word 'State' in the Constitution, where it extends the judicial power to cases between citizens of the several 'States', refers to the States of the Union. It is undoubtedly true that the District of Columbia is a separate political community in a certain sense, and in that sense may be

---

[6]Hise v. City of North Bend, (Ore.) 6 P.2d 31 at 32-3; People v. McKean, (California) 243 P. 898 at 900; In re Great Western Petroleum Corporation, (Cal.) 16 Fed. Supp. 247 at 249; Hodgson v. Mountain & Gulf Oil Co., (Wyo.) 297 Fed. 269 at 272; Cooper River Bridge v. South Carolina Tax Commission, (S.C.) 188 S. E. 508 at 510.; Federal Chemical Co. v. Paddock, (Ky.) 94 S. W. 2d 645 at 649; Puritan Pharmaceutical Co. v. Pennsylvania R. Co., (Mo.) 77 S. W. 2d 508 at 511; Browning v. Dorton, (Mo.) 128 S. W. 230.

called a State; but the sovereign power of this qualified State is not lodged in the corporation of the District of Columbia, but in the government of the United States. * * *"
(*Metropolitan Railroad Co. v. District of Columbia*, 33 L. ed. 231 at 234, 132 U.S. 1, 10 S. Ct. 19; *Eidman v. Martinez*, 46 L. ed. 697 at 704, 184 U.S. 578, 22 S. Ct. 515; *Downes v. Bidwell*, 45 L. ed. 1088, 182 U.S. 244, 21 S. Ct. 770; *Alaska v. Troy*, 66 L. ed. 487, 258 U.S. 101, 42 S. Ct. 241; *Wynne v. United States*, 54 L. ed. 748, 217 U.S. 234, 30 S. Ct. 447; *People v. Black* (Cal.), 54 P. 385.)

"* * * Without stopping to inquire as to the different meanings of the word 'state', we find that it has a definite, fixed, certain, legal meaning in this country and under our form of government. It had acquired this meaning when the constitution was adopted, and this is the one which must be attached to it when used in that instrument, or in laws of Congress. What is that meaning? It means one of the commonwealths or political bodies of the American Union, and which, under the constitution, stand in certain specified relations to the national government, and are invested as commonwealths with full power, in their several spheres, over all matters not expressly inhibited. * * *"
(*Ex parte Morgan* (Ark.), 20 F. 298 at 304.)

While the word "state" may by the context be considered to include other governmental organizations than the states of the Union, the converse has not been the general rule. (*Houston East & West Texas Ry. Co. v. Inman, Akers & Inman* (Tex.), 134 S.W. 275 at 277.)

Section 901(c) mentions territories, possessions and District of Columbia. These are not states since there are specific organizations to which, apart from the District of Columbia, such mention attached, namely, among possibly others, *Puerto Rico v. Shell Co.*, 82 L. ed. 235 at 241; 302 U.S. 253, 58 S. Ct. 167; *Alaska*, Title 48 U.S.C.A., Section 21 et seq; *Hawaii*, Title 48 U.S.C.A., Section 500; *Puerto Rico*, Title 48 U.S.C.A., Section 733; *Philippines*, 48 U.S. C.A., Section 1001-6; *Virgin Islands*, 48 U.S.C.A., Section 1391.

In contemporaneous cognate statutes, Congress, desiring to clearly and unequivocally designate the states, found no difficulty in undeviatingly using this definite and unam-

biguous designation, as appears from the quotations.[7] "States" not "territories" is the generic term and "states" was therefore purposely omitted.

 Respondent urges, however, that if the word "government" did not include the states of the Union, it is almost meaningless. There were three cogent reasons which might have actuated Congress in making the Price Control Act not applicable to states; (1) That the states or their political subdivisions are not generally engaged in trade and commerce and the evident and expressed intention of the statute was to control prices in the broad flow of commercial transactions, not the comparatively limited and isolated sales by states or their political subdivisions; (2) other national governments, as distinguished from the United States for themselves and their nationals, where extensively buying and selling within the United States; and (3) an appreciation by Congress of the necessary recognition and maintenance between the sovereignty of the United States and the sovereignties, though subordinate, of the constituent states; that the states own property, much of it in trust, as do their political subdivisions, but

---

[7] Title 33 U.S.C.A. Section 511. Alteration of Bridges. " * * * The term 'bridge owner' shall also mean and include all joint owners, particularly States, counties, municipalities, or other participants in ownership of bridges for both railroad and highway traffic. * *" June 21, 1940, c. 409, Section 1, 54 Stat. 497.

Title 7, U.S.C.A. Section 456. Farm Credit Administration. "The Governor of the Farm Credit Administration may make such rules and regulations as may be deemed advisable to carry out the provisions of this chapter and may cooperate with any department or agency of the Government, any State, Territory, District, or possession, or department, agency, or political subdivision thereof, or any person. * * * " July 2, 1926, c. 725, Section 6, 44 Stat. 803; October 1, 1929, Ex. Or. 5200; March 27, 1933, Ex. Or. 6084.

Title 29 U. S. C. A. Section 152(2). National Labor Relations. "The term 'employer' includes any person acting in the interest of an employer, directly or indirectly, but shall not include the United States, or any State or political subdivision thereof. * *" July 5, 1935, c. 372, Section 2, 49 Stat. 450.

Title 29 U.S.C.A. Section 203(c). Fair Labor Standards. 'State' means any State of the United States or the District of Columbia or any Territory or possession of the United States." June 25, 1938, c. 676, Section 3, 52 Stat. 1060.

that the regulation and control and disposition of the same has always been solely within the local governmental control of the states, a field of action upon which the Federal Government has been sedulous in not trespassing or encroaching. (*Kelly v. State of Washington,* 82 L. ed. 3, 302 U.S. 1, 58 S. Ct. 87.)

"But it is plain that the prorate program here was never intended to operate by force of individual agreement or combination. It derived its authority and its efficacy from the legislative command of the state and was not intended to operate or become effective without that command. We find nothing in the language of the Sherman Act or in its history which suggests that its purpose was to restrain a state or its officers or agents from activities directed by its legislature. In a dual system of government in which, under the Constitution, the states are sovereign, save only as Congress may constitutionally subtract from their authority, an unexpressed purpose to nullify a state's control over its officers and agents is not lightly to be attributed to Congress." (*Parker v. Brown,* 87 L. ed. 315 at 325-326, 317 U.S. 341, 63 S. Ct. 307.)

Title 15 U.S.C.A. Section 78c. Regulation of Securities Exchanges. "(6) The term 'bank' means (A) a banking institution organized under the laws of the United States, (B) a member bank of the Federal Reserve System, (C) any other banking institution, whether incorporated or not, doing business under the laws of any State or of the United States. * * *"
"(16) The term 'State' means any State of the United States, the District of Columbia, Alaska, Hawaii, Puerto Rico, the Philippine Islands, the Canal Zone, the Virgin Islands, or any other possession of the United States."
"(17) The term 'interstate commerce' means trade, commerce, transportation, or communication among the several States, or between any foreign country and any States, or between any State and any place or ship outside thereof." June 6, 1934, c. 404, Section 3, 48 Stat. 882; August 23, 1935, c. 614, Section 203(a), 49 Stat. 704. Title 26 U.S.C.A. Section 3522. Bituminous Coal. *"Resale for governmental use.* Under regulations prescribed by the Commissioner with the approval of the Secretary, a credit against the tax imposed by subsection (a) of section 3520 or a refund may be allowed or made to any producer of coal in the amount of such tax paid with respect to the sale of coal to any vendee, if the producer has in his possession such evidence as the regulations may prescribe that such

The second of the above reasons is not alone pertinent because of the context but also because of the departmental activities, construing and extensively acting upon the conclusion that this portion of the definition applies to foreign nations as 'other' governments, certainly not in the category of domestic states.

 The portions of official pronouncements of the Office of Price Administration in their publications, cited in the note,[8] comprehensively cover and sufficiently show the official theories and practice as to the statutory coverage of "governments," i.e., that "governments" meant, as the context of the act amply indicates, other national sovereignties comparable with the United States as a nation not subdivisions or agencies thereof.

The statistical abstract of the United States as promulgated by the Department of Commerce, 1942, together with the report of the United States Department of Commerce on Foreign Commerce and Navigation to the United States for 1941, together with possible later tabulations showing the amount, volume and trend of exports and imports,

---

coal was resold by any person for the exclusive use of the United States or of any State, Territory of the United States, or the District of Columbia, or any political subdivision of any of them, for use in the performance of governmental functions." 54 Stat. 431.

Title 46 U.S.C.A. Section 1244 (b). Maritime Labor Relations. " * * * The term 'person' includes corporations, partnerships, and association, existing under or authorized by the laws of the United States, or any State, Territory, District, or possession thereof, or of any foreign country." June 29, 1936, c. 858, Title IX, Section 905, 49 Stat. 2016; June 23, 1938, c. 600, Section 39, 52 Stat. 964.

Reforestation. Act. of March 31, 1933, 73rd Congress, First Session, c. 17, Senate Bill 598, Public No. 5, 48 Stat. 22.

Title 7, U.S.C.A. Section 511 (i). Tobacco Inspection Act. " * * * 'Commerce' means commerce between any State, Territory, or possession, or the District of Columbia, and any place outside thereof; or between points within the same State, Territory or possession, or the District of Columbia, but through any place outside thereof; or within any Territory or possession, or the District of Columbia. * * * * * For the purpose of this paragraph the word 'State' includes Territory, the District of Columbia, possession of the United States, and foreign nations." Aug. 23, 1935, c. 623, Section 1, 49 Stat. 731.

were, of course, available to Congress and no doubt relied upon by it in determining it was necessary to make the law applicable to governments recognized as such other than the United States.

The magnitude of these transactions speaks for itself. One instance suffices to illustrate, the 16th report to Congress on lend-lease operations for the period ending June 30, 1944, Page 58, Table 20, shows total exports alone to have been $21,535,000,000 (United Kingdoms (Great Britain), U.S.S.R. (Russia), Africa, Middle East, Mediterranean Area, China, India, Australia, New Zealand, and other countries) being the recipients.)

The third element is supported by overwhelming authority.

"* * * An inroad upon local conditions and local standards of such far-reaching import as is involved here, ought to await a clearer mandate from Congress. The problem now before us is very different from that which was recently presented by *United States v. Darby,* No. 82, decided February 3, 1941 (312 U.S. 100, ante, 609, 61 S. Ct. 451, 132 A.L.R. 1430). We had there to consider the full scope of the constitutional power of Congress under the Commerce Clause in relation to the subject matter of the Fair Labor Standards Act. *This case presents the narrow question of what Congress did, not what it could do.* (Emphasis ours). And we merely hold that to read 'unfair methods of competition in (interstate) commerce' as though it meant 'unfair methods of competition in any way affecting interstate commerce,' requires, in view of all the relevant considerations, much clearer manifestation of intention than Congress has furnished." (*Federal Trade*

---

[3] "A Manual of Price Control" dated December 1942-March 1943, Lecture series Delivered at the Training Program for Price of the Office of Price Administration, published by the United States Printing Office, presented by Seymour E. Harris, Chairman of Training Committee of Price Department, Pages 221-234.

"Tenth Quarterly Report" for period ended June 30, 1944 Office of Price Administration, Chester Bowles, Administrator, printed by the United States Printing Office. Page 28.

"Second Revised Maximum Export Price Regulation" issued by Office of Export-Import Price Control, Office of Price Administration, May, 1943, printed by the United States Printing Office. Pages 1-2.

*Commission v. Bunte Bros.*, 85 L. ed. 881 at 885, 312 U.S. 349, 61 S. Ct. 580.)

"To be sure, in recent years Congress has from time to time exercised authority over purely intrastate activities of an interstate carrier when, in the judgment of Congress, an interstate carrier constituted, as a matter of economic fact, a single organism and could not effectively be regulated as to some of its interstate phases without drawing local business within the regulated sphere. But such absorption of state authority is a delicate exercise of legislative policy in achieving a wise accommodation between the needs of central control and the lively maintenance of local institutions. Therefore, in construing legislation this court has disfavored inroads by implications on state authority and resolutely confined restrictions upon the traditional power of states to regulate their local transportation to the plain mandate of Congress." (*Palmer v. Massachusetts*, supra.)

It can hardly be successfully or plausibly argued that regulation of prices is on a higher plane than regulation of interstate commerce.

"\* \* \* If this old and familiar power of the states was withdrawn when Congress gave district courts bankruptcy powers over railroads, we ought to find language fitting for so drastic a change." (*Palmer v. Massachusetts*, supra.)

"\* \* \* In sum, we cannot sacrifice the 'plain, obvious and rational meaning' of the statute even for 'the exigency of a hard case'." (*Deputy v. duPont*, 84 L. ed. 416 at 424, 308 U.S. 488, 60 S. Ct. 363.)

"\* \* \* Hence, in absence of special circumstances, we assume that when Congress authorized federal instrumentalities of the type here involved to 'sue and be sued' it used those words in their usual and ordinary sense. \* \* \*" (*Federal Housing Administration v. Burr*, 84 L. ed. 724 at 729, 309 U.S. 242, 60 S. Ct. 488.)

No special circumstances are disclosed by the statute in question which by its internal implications and suggested applications reveal that Congress considered states as actors had to be included to facilitate or encompass adequate or expressed Federal control of prices in the ordinary channels of trade and commerce to prevent inflation.

Considering that Congress clearly indicated a desire to completely and comprehensively control prices, the choice of words by Congress may not be disregarded nor can we assume or presume that their change or phraseology is without significance.

"We cannot assume that Congress in thus revising the statute, was unaware of the history which we have just detailed, or certainly that it regarded as without significance the omission from the earlier act of the phrase 'either party', and the substitution for it of the phrase authorizing removal by the 'defendant or defendants' in the suit, or the like omission of the provision for removal at any time before the trial, and the substitution for it of the requirement that the removal petition be filed by the 'defendant' at or before the time he is required to plead in the state court." (*Shamrock Oil & Gas Corp. v. Sheets*, 85 L. ed. 1214 at 1218, 313 U.S. 100, 61 S. Ct. 868.)

Sovereign states are never included in a statute unless such intention is clearly manifest. (*People v. Mellor*, (Mich.), 5 N.W. (2d) 453 at 455; *State v. Marin Municipal Water Dist.* (Cal.), 111 P. (2d) 651; *Morris v. State*, (Okla.), 212 P. 588; *State Land Board v. Campbell* (Ore.), 13 P. (2d) 346; *State v. Superior Court for Thurston County* (Wash.), 114 P. (2d) 1001; *United States v. Mayo* (Fla.), 47 F. Supp. 552; *State v. Reis* (Wis.), 284 N.W. 580; *Walker v. Turner* (Tenn.), 122 S.W. (2d) 804; *Brooks v. One Motor Bus, etc.* (S.C.), 3 S.E. (2d) 42.)

"* * * if the purpose was to include the United States (states) 'the ordinary dignities of speech would have led' to its (their) mention by name. * * *" (*United States v. Cooper Corp.*, supra.)

Respondent urges that *California v. United States*, 64 S. Ct. 352 at 356, holding that "person" used in the Shipping Act, c. 451, 39 Stat. 728, c. 152, 40 Stat. 900, 46 U.S.C., Section 801, 46 U.S.C.A. Section 801, defined as including corporations, partnerships and associations, covered states and municipalities, completely supports their contention that the statute herein likewise includes states and municipalities. The statute there, however, expressly covered states and hence, as pointed out by the court, no construction was ncessary to conclude that Congress intended the act to cover states by implication because by express

declaration it covered states, which would include its subdivisions.

 The construction of the sentence in the definition of the word "person", attaches to the United States only "any agency thereof". The term "political subdivision" is subjoined to "any other government". "Agency" is twice used, thus emphasizing the importance and also the limitation connoted in connection therewith. Obviously the term "agency" as here used denotes a governmental not commercial relationship. The essential characteristics of "agency", namely power or authority from a superior to an inferior, and controlled representation of one by another, nevertheless must have persisted, or Congress would not have used the word. Undoubtedly the states are subordinate to the Federal Government. However, they do not derive their sovereignty from the Federal Government. (*United States v. Butler*, 80 L. ed. 477 at 487-8, 297 U.S. 1, 56 S. Ct. 312, 102 A.L.R. 914.) The states might be agents for the Federal Government, but the general, ordinary and juristic concept of the relationship is not that of governmental principal and agent.

 The term "agency" in governmental parlance, as will clearly appear by reference to its use in the noted executive orders, statutes and decisions, has never been used as encompassing the states as such.[9]

---

[9]Korman v. Federal Housing Administrator, (District of Columbia C.C.A.), 113 F.2d 743 at 745; Sunshine Anthracite Coal Co. v. Adkins, (Ark.) 31 F. Supp. 125 at 130; Sanchez v. United States (1st C.C.A.) 134 F.2d 279 at 283; City of Philadelphia v. National Surety Corp. (Pa.), 48 F. Supp. 381 at 383; United States v. Golden Gate Bridge and H. Dist., (Cal.) 37 F. Supp. 505; Board of Education, Etc. v. Home Real Estate Imp. Corp., (Ill.), 38 N. E. 2d 17; City of Middlesboro v. Kentucky Utilities Co., (Ky.) 146 S.W.2d 48; Craig v. Federal Land Bank of New Orleans, (Miss), 194 So. 589 at 592; Federal Land Bank of New Orleans v. Garner, (Miss.) 184 So. 469; Cohn v. United States Shipping Board, (6th C.C.A.), 20 F. 2d 56; Commissioner of Internal Revenue v. Harlan, (9th C.C.A.) 80 F.2d 660; Helms v. Emergency Crop & Seed Loan Office, (N.C.) 5 S.E.2d 822; Roberts v. Federal Land Bank of New Orleans, (Miss.), 196 So. 763; Montana Nat. Bank v. Yellowstone County, (Mont.) 252 P. 876 at 879; First Nat. Bank of Portland v. Marion County, (Ore.) 130 P. 2d 9.

■■■■■■ *Davies Warehouse Co. v. Bowles,* 64 S. Ct. 474 at 479-480-481, 321 U.S. 144, thus disposes of respondent's contention that the Administrator's construction is controlling, and the main theme of respondent's argument.

"[13] 4. Lastly, it is contended that we should accept the Administrator's view in deference to administrative construction. The administrative ruling in this case was no sooner made than challenged. We cannot be certain how far it was determined by the considerations advanced, mistakenly as we think, in its defense in this case. It has hardly seasoned or broadened into a settled administrative practice. If Congress had deemed it necessary or even appropriate that the Administrator's order should in effect be final in construing the scope of the national price-fixing policy, it would not have been at a loss for words to say so. We do not think it should overweigh the considerations

EXECUTIVE ORDERS

8248 "Establishing the Divisions of the Executive Office of the President and Defining their Functions and Duties." 9/8/39

8283 "Amendment of Section 6 of Civil Service Rule II." 11/9/39

8807 "Establishing the Office of Scientific Research and Development in the Executive Office of the President and Defining its Functions and Duties." 6/28/41

9023 "Extension of the Provisions of Executive Order No. 9001 of December 27, 1941, to Contracts of the Treasury Department, the Department of Agriculture, the Federal Works Agency, the Panama Canal, the Government Printing Office, and the National Advisory Committee for Aeronautics." 1/14/42

9024 "Establishing the War Production Board in the Executive Office of the President and Defining its Functions and Duties." 1/16/42

9069 "Consolidating Certain Agencies within the Department of Agriculture." 2/23/42

9134 "Amendment of Executive Order No. 8757 of May 20, 1941, establishing the Office of Civilian Defense." 4/15/42

9135 "Establishing the Interdepartmental Committee for the voluntary Pay Roll Savings Plan for the Purchase of War Savings Bonds." 4/16/42

9361 "Supplementing the Executive Order establishing the Office of War Mobilization and Providing for the Unifying of Foreign Economic Affairs." 7/15/43

9380 "Foreign Economic Administration." (9/25/43)

we have set forth as to the proper construction of the statute. * * *"

and

"[3,4] We think Congress desired to depart from the traditional partitioning of functions between state and federal government only so far as required to erect emergency barriers against inflation. No question as to the power of Congress to reach and regulate this business, should it find it necessary to do so, has been raised here. But as a matter of policy Congress may well have desired to avoid conflict or occasions for conflict between federal agencies and state authority which are detrimental to good administration and to public acceptance of an emergency system of price control that might founder if friction with public authorities be added to the difficulties of bringing private self-interest under control. Where Congress has not clearly indicated a purpose to precipitate conflict, we should be reluctant to do so by decision. In view of assurances to Congress that the evil would proceed only in a minor degree, if at all, from public utilities already under state price control, we think Congress did not intend, and certainly has given no clear indication that it did intend, to supersede the power of a state regulatory commission, exercising comprehensive control over the prices of a business appropriately classified as a utility. Classification by California of the public warehouse business as a utility is not novel, surprising, or capricious. The regulation imposed is not merely nominal or superficial but appears to be penetrating and complete. Therefore, we would have little hesitation in holding that petitioner's public warehouse under the circumstances is a public utility within the exemption of the Price Control Act, but for certain practical objections to that interpretation, urged on behalf of the Administrator with an earnestness which deserves, in view of the difficulties and importance of his task, careful examination."

"* * * A federal system makes a merit, instead, of the very local autonomy in which complexities are inherent. Nor would the interpretation advocated by the Administrator avoid the necessity of ascertaining and considering rights thought to be possessed under local laws and not likely to be yielded readily. (In the case at bar, in futuro, under respondent's theory, whether state or subsidiary functions be governmental or proprietary.) One effect of

the Administrator's interpretation would be to postpone study of local laws from consideration in connection with wise administration to the time of litigation, as in this case. Local institutions, customs, and policies will not be overridden without fighting for consideration. The existence and force and function of established institutions of local government are always in the consciousness of lawmakers and, while their weight may vary, they may never be completely overlooked in the task of interpretation. At a time when great measures of concentration of direction are concededly necessary, it may be thought more farsighted to avoid paralyzing or extinguishing local institutions which do not seriously conflict with the central government's place. Congress has given no indication that it would draw all such state authority into the vortex of the war power. Nor should we rush the trend to centralization where Congress has not. It could never be more appropriate than now to heed the maxim reiterated recently by the Court that 'the extension of federal control into these traditional local domains is a "delicate exercise of legislative policy in achieving a wise accommodation between the needs of central control and the lively maintenance of local institutions." ' * * *"

█ The above federal expositions lead unerringly to the conclusion that Congress did not intend the statute to apply to the States. This disposition renders unnecessary a consideration of the other points raised and contraverted.

The judgment is therefore reversed and the cause remanded with instructions to enter judgment on the pleadings in favor of appellant.

Ailshie, C.J., and Budge, Holden, and Miller, JJ., concur.