CASE, COMMISSIONER OF PUBLIC LANDS OF THE STATE OF WASHINGTON, *v.* BOWLES, PRICE ADMINISTRATOR, ET AL.

No. 261. Argued January 10, 1946.—Decided February 4, 1946.

*R. A. Moen,* Assistant Attorney General of Washington, argued the cause for petitioner. With him on the brief were *Smith Troy,* Attorney General, and *Edwin C. Ewing,* Assistant Attorney General.

*Robert L. Stern* and *Abraham Glasser* argued the cause for the Price Administrator, respondent. With them on the brief were *Solicitor General McGrath* and *Milton Klein.*

Submitted on brief for the Soundview Pulp Company, respondent, by *W. Z. Kerr* and *E. S. McCord.*

MR. JUSTICE BLACK delivered the opinion of the Court.

The Congressional Enabling Act providing for the State of Washington's admission to the Union granted certain lands to that State "for the support of common schools." 25 Stat. 676, 679. Section 11 of the Enabling Act provided that these lands should "be disposed of only at public sale, and at a price not less than ten dollars per acre . . ." The State Constitution provides that these lands shall not be sold except "at public auction to the highest bidder" at a price which may not be below both the full market value found after appraisal and "the price prescribed in the grant" of these lands. In 1943 the State Commissioner of Public Lands held a public auction for the sale of timber on school lands. At that auction the Soundview Pulp Company, one of the respondents, bid $86,335.39 for some of the timber. This amount exceeded by approximately $9,000.00 the ceiling price fixed by Maximum Price Regulation No. 460.[1] The Price Administrator advised Soundview that consummation of the sale at the bid price would constitute a violation of the regula-

---

[1] 8 Fed. Reg. 11850, as amended, 8 Fed. Reg. 13023.

tion and of the Emergency Price Control Act.[2] Thereafter Soundview and the unsuccessful bidder, Coos Bay Pulp Corporation, commenced actions in the state courts, seeking an adjudication as to the legality of Soundview's bid and of the proposed transfer of timber to Soundview. This resulted in a holding by the state supreme court that the Emergency Price Control Act did not bar the sale of school-land timber at prices above the ceiling. *Soundview Pulp Co.* v. *Taylor,* 21 Wash. 2d 261, 150 P. 2d 839. When, after this judgment was rendered, the parties were about to complete the sale, the Price Administrator commenced this action in the federal district court to enjoin the State Commissioner of Public Lands and Soundview from completing the timber transaction at a price above the ceiling fixed by the regulation. The district court held that the Emergency Price Control Act did not grant the Price Administrator authority to set maximum prices for school-land timber sold by the State. The circuit court of appeals reversed. 149 F. 2d 777. Because the circuit court's decision conflicted with that of the Supreme Court of Idaho in *Twin Falls County* v. *Hulbert,* 66 Idaho —, 156 P. 2d 319, we granted certiorari in both cases.

Before considering the principal questions raised by the State, we shall at the outset briefly dispose of certain procedural contentions. The State urges that the complaint should have been dismissed because it was signed by attorneys employed by the Price Administrator and not by the District Attorney or members of the Department of Justice. True, 28 U. S. C. 485 makes it the duty of every district attorney to prosecute most civil actions to which the United States is a party. But this section does not prescribe the procedure under the Emergency Price Control Act, for that Act specifically empowers the Administrator to commence actions such as this one and authorizes

---

[2] 56 Stat. 23, 58 Stat. 640; c. 214, 59 Stat. 306.

attorneys employed by him to represent him in such actions. § 201 (a). The State contends further that this case should have been tried by a district court composed of three judges because § 266 of the Judicial Code requires such a proceeding whenever enforcement of a state statute is sought to be enjoined on the ground that the statute is unconstitutional. But here the complaint did not challenge the constitutionality of the state statute but alleged merely that its enforcement would violate the Emergency Price Control Act. Consequently a three-judge court is not required. *Ex parte Bransford,* 310 U. S. 354, 358–359; *Query* v. *United States,* 316 U. S. 486, 488–489. Another procedural point urged by the State is that since this is in effect a controversy between the United States and the State of Washington, the United States Supreme Court has exclusive jurisdiction under Article III, § 2, Clause 2, of the United States Constitution and the district court lacked power to try the case. But it is well settled that despite Article III, Congress can give the district courts jurisdiction to try controversies between a State and the United States.[3] Congress has given the district court power to try cases such as this one. While § 233 of the Judicial Code does give this Court exclusive jurisdiction to try cases between a State and the United States, § 205 (c) of the Emergency Price Control Act specifically provides that the district court shall have jurisdiction over all enforcement suits. To that extent · § 205 (c) of the Price Control Act supersedes § 233 of the Judicial Code. *United States* v. *California,* 297 U. S. 175, 186.

The State's principal contention is that sales by a State, such as the one here involved, are not and cannot be made subject to price control. ·Maximum Price Regulation No; 460, which the State's sale of timber allegedly violated,

---

[3] *Ames* v. *Kansas,* 111 U. S. 449; *United States* v. *Louisiana,* 123 U. S. 32; *United States* v. *California,* 297 U. S. 175.

specifically provides that it is applicable to sales by States. The State makes the following contentions: (1) Insofar as the regulation applies to state sales it is unauthorized by the Emergency Price Control Act, since Congress did not intend that Act to apply to States. (2) Even if the Act was intended to apply to state sales, the Act should not be construed as authorizing the Price Administrator to fix a maximum price at which timber on school-land grants can be sold by States. (3) If the Act is so con-strued, it violates the Fifth and Tenth Amendments to the Constitution.

We ordinarily would not pass on the statutory authority of the Administrator to promulgate the regulation in a proceeding such as this one. For Congress has granted exclusive initial jurisdiction to determine this question to the Emergency Court of Appeals. *Lockerty* v. *Phillips,* 319 U. S. 182. But while the Act thus denies a defendant in an enforcement proceeding the right to challenge the validity of the regulation, it does not deny him the right to attack the Emergency Price Control Act itself on constitutional grounds. *Yakus* v. *United States,* 321 U. S. 414, 430. Of course, this right may not be utilized as a means of indirectly attacking the regulations themselves instead of the statute. But here petitioner's third contention that Congress lacks authority to regulate the prices of state school-land timber extends beyond the implementing regulation and strikes at the Act itself. In order to reach this constitutional question, we first have to decide whether the Act, properly interpreted, is applicable to sales by States, including sales of timber on school-grant lands.

The Emergency Price Control Act grants to the Price Administrator broad powers to set maximum prices for commodities and rents and makes it unlawful for "any person" to violate these maximum price regulations. Section 302 (h) defines a "person" as including "an individ-

ual, corporation, partnership, association, or any other organized group of persons, or legal successor or representative of any of the foregoing, and includes the United States or any agency thereof, or any other government, or any of its political subdivisions, or any agency of any of the foregoing." This language on its face, and given its ordinary meaning, would appear to be broad enough to include any person, natural or artificial, or any group or agency, public or private, which sells commodities [4] or charges rents. The argument that the Act should not be construed so as to include a State within the enumerated list made subject to price regulation, rests largely on the premise that Congress does not ordinarily attempt to regulate state activities and that we should not infer such an intention in the absence of plain and unequivocal language. Petitioner presses this contention so far as to urge us to accept as a general principle that unless Congress actually uses the word "state," courts should not construe regulatory enactments as applicable to the States. This Court has previously rejected similar arguments,[5] and we cannot accept such an argument now.

We think it too plain, to call for extended discussion, that Congress meant to include States and their political subdivisions when it expressly made the Act applicable to the United States "or any other government, or any of its political subdivisions, or any agency of any of the foregoing . . ." Congress clearly intended to control all commodity prices and all rents with certain specific exceptions which it declared. It would frustrate this purpose for

---

[4] Section 302 of the Act defines "commodity" as including "services rendered otherwise than as an employee in connection with the processing, distribution, storage, installation, repair, or negotiation of purchases or sales of a commodity, or in connection with the operation of any service establishment for the servicing of a commodity."

[5] *Ohio* v. *Helvering,* 292 U. S. 360, 370; *United States* v. *California,* 297 U. S. 175, 186; *California* v. *United States,* 320 U. S. 577, 585.

courts to read exemptions into the Act which Congress did not see fit to put in the language. Excessive prices for rents or commodities charged by a State or its agencies would produce exactly the same conditions as would be produced were these prices charged by other persons. We, therefore, have no doubt that Congress intended the Act to apply generally to sales of commodities by States.[6]

Nor can we accept the contention that a special exemption could be read into the Act in order to permit States holding land granted for school purposes to charge more than the ceiling price set for timber. In reaching this conclusion we are not unaware of the difficulties which confronted the Commissioner of Public Lands of the State of Washington, nor of the importance of protecting the public interest in those school lands. Both the Act of Congress, which granted the land to Washington, and the Constitution of the State, had provided for safeguards in connection with the disposition of school lands. We do not question the wisdom of these precautions. We are mindful also of the fact that this Court has declared that grants of land to the State, like those here involved, transferred exclusive ownership and control over those lands to the State. *Cooper* v. *Roberts,* 18 How. 173. No part of all the history concerning these grants, however, indicates a purpose on the part of Congress to enter into a permanent agreement with the States under which States would be free to use the lands in a manner which would conflict with valid legislation enacted by Congress in the national interest. Here again, the sale of school-land timber at above-ceiling prices could be just as disturbing to the national inflation-control program as the charging of excess prices for timber located on any other lands.

---

[6] The Emergency Court of Appeals recently considered the same question and reached the same conclusion. *Dallas* v. *Bowles,* 152 F. 2d 464.

We now turn to petitioner's constitutional contention. Though as we have pointed out petitioners have alleged that the Act applied to setting a maximum price for school-land timber violates the Fifth and Tenth Amendments, the argument here seems to spring from implications of the Tenth Amendment only. The contention rests on the premise that there is a doctrine implied in the Federal Constitution that "the two governments, national and state, are each to exercise its powers so as not to interfere with the free and full exercise of the powers of the other." It is not contended, and could not be under our prior decisions, that the ceiling price fixed by the Administrator is constitutionally invalid as applied to privately owned timber. *Yakus* v. *United States,* 321 U. S. 414; *Bowles* v. *Willingham,* 321 U. S. 503. Nor is it denied that the Administrator could have fixed ceiling prices if the State had engaged in a sales business "having the incidents of similar enterprises usually prosecuted for private gain." *Allen* v. *Regents,* 304 U. S. 439, 452. But it is argued that the Act cannot be applied to this sale because it was "for the purpose of gaining revenue to carry out an essential governmental function—the education of its citizens." Since the Emergency Price Control Act has been sustained as a congressional exercise of the war power, the petitioner's argument is that the extent of that power as applied to state functions depends on whether these are "essential" to the state government. The use of the same criterion in measuring the constitutional power of Congress to tax has proved to be unworkable,[7] and we reject it as a guide in the field here involved. Cf. *United States* v. *California, supra,* 297 U. S. at 183–185.

The State of Washington does have power to own and control the school lands here involved and to sell the lands

[7] See the several opinions in *New York* v. *United States,* 326 U. S. 572.

or the timber growing on them, subject to the limitations set out in the Enabling Act. And our only question is whether the State's power to make the sales must be in subordination to the power of Congress to fix maximum prices in order to carry on war. For reasons to which we have already adverted, an absence of federal power to fix maximum prices for state sales or to control rents charged by a State might result in depriving Congress of ability effectively to prevent the evil of inflation at which the Act was aimed. The result would be that the constitutional grant of the power to make war would be inadequate to accomplish its full purpose. And this result would impair a prime purpose of the Federal Government's establishment.

To construe the Constitution as preventing this would be to read it as a self-defeating charter. It has never been so interpreted. Since the decision in *McCulloch* v. *Maryland,* 4 Wheat. 316, 420, it has seldom if ever been doubted that Congress has power in order to attain a legitimate end—that is, to accomplish the full purpose of a granted authority—to use all appropriate means plainly adapted to that end, unless inconsistent with other parts of the Constitution. And we have said, that the Tenth Amendment "does not operate as a limitation upon the powers, express or implied, delegated to the national government." [8]

Where, as here, Congress has enacted legislation authorized by its granted powers, and where at the same time, a State has a conflicting law which but for the congressional Act would be valid, the Constitution marks the course for courts to follow. Article VI provides that "The Constitution and the Laws of the United States . . .

---

[8] *Fernandez* v. *Wiener,* 326 U. S. 340, 362. *United States* v. *Darby,* 312 U. S. 100, 124; *California* v. *United States, supra; United States* v. *California, supra; Oklahoma* v. *Atkinson Co.,* 313 U. S. 508, 534–535.

made in Pursuance thereof . . . shall be the supreme Law of the Land . . ." [9]

*Affirmed.*

MR. JUSTICE DOUGLAS would reverse the judgment for the reasons set forth in his dissenting opinion in *Hulbert* v. *Twin Falls County,* 327 U. S. 105.

MR. JUSTICE JACKSON took no part in the consideration or decision of this case.

---

[9] For application of this principle see *Hines* v. *Davidovitz,* 312 U. S. 52, 68; *Stewart & Co.* v. *Sadrakula,* 309 U. S. 94, 104.