**UNITED STATES v. CRONENWETH DAIRY CO. et al.**

Civ. A. No. 9895.

United States District Court
W. D. Pennsylvania.

Dec. 20, 1951.

---

5. Defendant failed to ship 7,991.5 bushels, and the principal amount of plaintiff's judgment will be $4,235.50.

Edward C. Boyle, U. S. Atty., W. Wendell Stanton, Asst. U. S. Atty., Pittsburgh, Pa., James J. Dillon, Sp. Asst. U. S. Atty., Pittsburgh, Pa., for the Government.

Willis F. Daniels (of Daniels, Swope & First), Harrisburg, Pa., A. F. Burhardt, Pittsburgh, Pa., for defendants.

Harry S. Dunmire, Pittsburgh, Pa., for Meadow Gold Dairies, Inc.

E. Lowry Humes (of Humes & Kiebort), Meadville, Pa., amicus curiæ for Dairymen's Cooperative Sales Assn. and Erie-Crawford Dairy Assn., Known as Pittsburgh, Erie & Johnstown-Altoona Areas (Nos. 2, 7 and 9).

Robert E. Woodside, Atty. Gen. of Pennsylvania, Henry M. Bruner, Chief Counsel, Pennsylvania Milk Control Commission, Harrisburg, Pa., for intervenors Pennsylvania Milk Control Commission.

Elmer E. Harter, Jr. (of Prowell & Harter), Harrisburg, Pa., for intervenors Processors in Erie Milk Marketing Area (#7).

MARSH, District Judge.

The United States asks that an injunction issue against 13 defendants who are processors of milk and milk products in the Pittsburgh Milk Marketing Area, and alleges that they are selling processed milk and milk products at prices in excess of the maximum prices established by the General Ceiling Price Regulation promulgated by the Office of Price Stabilization pursuant to the Defense Production Act of 1950 and its amendments. 50 U.S.C.A. Appendix, § 2061 et seq. The Pennslyvania Milk Control Commission which by State law fixes prices for the milk industry, including the prices at which the defendant processors sell their products, asked leave to intervene as a party defendant which was granted. Processors in the Erie Milk Marketing Area were also granted leave to intervene. Certain producers of milk appeared by counsel amicus curiae. Several legal questions were presented for solution, but, insofar as prices are concerned, the narrow issue for decision is whether the prices of standard milk being sold by defendants at 23 cents per quart retail and 21 cents per quart wholesale are in excess of the maximum ceiling prices established by O.P.S. In the opinion of the court they are not.. From the pleadings, stipulations, and evidence, the following are the

### Findings of Fact

1. The defendants in this proceeding are processors of milk and are doing business in the Western District of Pennsylvania in the Pittsburgh Milk Marketing Area.

2. The Pennsylvania Milk Control Commission (Commission) intervened as a party defendant in this proceeding. This Commission was created by an Act of the General Assembly approved April 28, 1937, P.L. 417, as amended, 31 Pa. Purdon's Statutes, § 700j–101 et seq., and by virtue of said Act has the power and duty, inter alia, to fix the minimum prices at which milk and milk products shall be sold by producers and processors in the Pittsburgh Milk Marketing Area (Pittsburgh Area). Penalties are imposed for non-compliance.

3. The General Ceiling Price Regulation (G.C.P.R.) issued by the Office of Price Stabilization (O.P.S.) purported to freeze the price of all commodities at the highest price charged for said commodities during the base period which is from December 19, 1950, to January 25, 1951 (Sections 1 and 3, 16 F.R. 808, 812).

4. The highest prices at which the defendant processors sold milk[1] during the base period are as follows:

Retail per quart ........ 21 cents
Wholesale per quart .... 19 cents

By order[2] of the Commission the processors were required to pay to the producers of milk, during this period, $5.35 per cwt.

5. Pursuant to requests by the Commission, O.P.S., by Order No. L–1, dated April 3, 1951, effective April 6, 1951, adjusted the ceiling prices for processors of milk in the Pittsburgh Area by increasing the processors' milk prices 1 cent per quart. It also purported to approve an increased price to producers of 32 cents per cwt.[3]

6. Pursuant to the aforesaid order of O.P.S., the Commission ordered[4] and the defendants sold milk from April 16, 1951 to July 16, 1951, at the following prices:

Retail per quart ........ 22 cents
Wholesale per quart .... 20 cents

According to the Commission's order[4] the processors were required to pay to the producers, during this period, $5.70 per cwt., which was an increase of 35 cents per cwt. instead of 32 cents per cwt. contemplated and approved by O.P.S.

7. The adjustment authorized by O.P.S. gave to defendant processors in the Pittsburgh Area 11–½ cents per cwt. or .247+

---

1. Milk prices used herein refer to standard milk having 4% butterfat and under.

2. General Order No. A–373, effective September 1, 1950.

3. O.P.S. had no authority to fix the producers' price of milk because the price to producers had not reached parity. See 50 U.S.C.A.Appendix, § 2102(d)(3), Defense Production Act of 1950, as amended, Sec. 402(d)(3).

4. General Order A–396, effective April 16, 1951.

of a cent per quart in excess of the increased price they were required to pay to the producers. This differential will be hereinafter referred to as the "processors' spread."

8. On July 11, 1951, the Commission again requested O.P.S. for authority to increase the processors' ceiling prices of milk 1 cent per quart. By letter dated July 23, 1951, and signed by the Director of O.P.S., this request was denied.

9. There is no evidence that the decision of O.P.S., denying the request of the Commission to increase the ceiling prices as aforesaid, was communicated to the defendant processors by the Commission. It does not appear that it was published in the Federal Register or otherwise.

10. Pursuant to an order [5] of the Commission promulgated July 10, 1951, defendants were required to sell milk from July 17, 1951, to the present time at the following prices:

Retail per quart ........ 23 cents
Wholesale per quart .... 21 cents

By this order of the Commission, the processors have been required to pay to the producers since July 17, 1951, $6.05 per cwt., which is an increase in processors' costs of 35 cents per cwt.

Despite the denial by O.P.S., the Commission permitted this order to remain in full force and effect.

11. The producers' prices for milk in the Pittsburgh Area, to the present time, have not exceeded parity.

12. O.P.S. has not issued a dollar and cents ceiling price order for retail and wholesale milk sold by processors. The ceiling price for defendant processors must be determined through the application of formulas and interpretations of G.C.P.R., Section 11(b)[6], Supplementary Regulation (SR) 20 [7] and the orders of O.P.S. Divergent interpretations give rise to at least three different ceiling prices. Defendants contend that 23 cents and 21 cents per quart are their correct ceiling prices since July 17, 1951. The Government contends 22-1/2 cents and 20-1/2 cents per quart are the correct ceiling prices to be charged by defendants since July 17, 1951. It could be argued that when, on July 23, 1951, O.P.S. disapproved the prices contained in the order effective July 17, 1951, the ceiling prices remained at 22 cents and 20 cents per quart pursuant to the O.P.S. order effective April 6, 1951, because defendants have since then made no effort to comply with G.C.P.R., Sec. 11(f).[8]

5. General Order A–415, effective July 17, 1951.

6. G.C.P.R. Sec. 11(b), as amended, provides in part:
   "(b) *Processors and Manufacturers.* This section applies to you only if:
   "(1) You sell a product which you process from one or more of the listed agricultural commodities * * * and
   "(2) The cost to you of a current customary purchase of the listed agricultural commodity * * * exceeds the highest price you incurred or paid during the base period. In such case you may increase the ceiling price (as otherwise determined in this regulation) for your product by the dollar-and-cent difference per unit between the highest price incurred or paid by you for a customary purchase during the base period and the cost to you of the most recent customary purchase.
   "If you have previously increased the ceiling price for your product, you may

increase your present ceiling price for the product by the dollar-and-cent difference per unit between the price upon which your last previous increase was based and the cost to you of the most recent customary purchase."

7. SR 20 (16 F.R. 3436) provides for the rounding of fractions of a cent in ceiling prices for milk as follows:

| "Range in the fraction (cents per quart) | Permissive increase in ceiling price (cents per quart) |
| --- | --- |
| 0–0.250 | 0 |
| 0.251–0.750 | ½ |
| 0.751–and over | 1" |

Section 2(c) provides: "(c) Irrespective of whether you have previously increased your ceiling price above your base period ceiling price, you must nevertheless make the 'parity' adjustment on the basis of your highest unit cost for a customary purchase during the base period."

8. G.C.P.R., Sec. 11(f) (as amended) in part provides: "(f) *Notice of 'Parity'*

Discussion
The Milk Industry Is Not
A Public Utility

■ The defendant processors contend that the milk industry of Pennsylvania is a public utility and is exempt from the operation of the Defense Production Act by virtue of Section 402(e)(v)[9] which exempts "Rates charged by any common carrier or other public utility".

They urge that in view of the fact that the term "public utility" has been held to include warehouses in California in Davies Warehouse Co. v. Bowles, 1943, 321 U.S. 144, 64 S.Ct. 474, 88 L.Ed. 635, and to include cotton gin plants in Oklahoma in Farmers' Gin Co. v. Hayes, D.C. W.D. Okl. 1943, 54 F.Supp. 47, under a similar exemption provision of the Emergency Price Control Act of 1942, 50 U.S.C.A. Appendix, § 901 et seq., Congress must have intended that the same interpretation would be applied to the Defense Production Act of 1950 and that this interpretation would exempt the dairy industry. We do not believe that the law as applied in the above cases should be applied to the facts in the instant case. In California, the constitution[10] declares that the warehouse business is a public utility and the legislation dealing with warehouses treats it as such. In Oklahoma, the statute declares cotton ginning to be a public utility. In both states, certificates of public convenience and necessity are required before new warehouses or cotton gin plants can be established. This requirement is characteristic of public utility legislation and is one which tends to minimize competition and to create, instead, a monopoly under public control. In Pennsylvania, however, the Public Utility Law[11] does not include the milk industry within its defined group of utilities. The milk industry in Pennsylvania is highly competitive and the Milk Control Law itself does not attempt to establish a public utility. The courts have upheld the Act on the theory that the milk industry is affected with a public interest. Rohrer v. Milk Control Board, 1936, 322 Pa. 257, 186 A. 336. It is also apposite to note that the Commission submitted to federal control under the Emergency Price Control Act of 1942 although the provision exempting public utilities in that Act is similar to the exemption provision of the Defense Production Act of 1950.

■ It appears to the court that it is more plausible that Congress had in mind the case of Nebbia v. New York, 1933, 291 U.S. 502, at page 531, 54 S.Ct. 505, at page 513, 78 L.Ed. 940, which dealt directly with the dairy industry and in which the Supreme Court, states "We may as well say at once that the dairy industry is not, in the accepted sense of the phrase, a public utility." The Nebbia case upheld the statute regulating the dairy industry as a valid exercise of police power over an industry affected with a public interest but it does not necessarily follow that if the industry is affected with a public interest it becomes a public utility.

Furthermore, the Defense Production Act of 1950, Section 402(d)(3), 50 U.S.C.A.Appendix, § 2102(d)(3), as amended by Section 104(d), c. 275, Public Law 96, provides that "[N]o ceiling prices to producers for milk or butterfat used for manufacturing dairy products shall be issued until and unless the Secretary of Agriculture shall determine that such prices are reasonable * * *." The necessary implication of this section is that if the prices to producers exceed the price set by the Secretary of Agriculture these prices would then

*Adjustment Increases.* (1) If you are a processor or a manufacturer to whom the provisions of Section 11(b) (2) are applicable, you may not increase your ceiling price for such commodity until you first notify the Director of Price Stabilization, Washington 25, D.C., by registered mail giving the following information: * * *" The information required is set out in detail in the remainder of the section.

9. Act of September 8, 1950, c. 932, Title IV, 64 Stat. 803, 50 U.S.C.A. 2102 Appendix, § (e) (v).

10. California Constitution, Art. IV, § 33.

11. Act of May 28, 1937, P.L. 1053, Art. I, § 2, 66 Pa.Purdon's Statutes, § 1102 (17), as amended.

be subject to control by O.P.S. To imply that Congress intended to exempt the dairy industry from the operation of the Act, would be to imply an intent contrary to the expressed intent of the Act. If Congress had intended to exempt the industries controlled by state agencies it could have easily done so.

We conclude, therefore, that Congress intended to control the milk industry in Pennsylvania and that said industry is subject to the operation of the Defense Production Act of 1950 and the orders and regulations promulgated thereunder.

### General Ceiling Price Regulations Supersede Prices Fixed By The Pennsylvania Milk Control Commission

█ Defendants further contend that neither Congress nor the O.P.S. has manifested a clear and unequivocal intention to supersede the Milk Control Law of Pennsylvania. The case of H. P. Welch Co. v. New Hampshire, 1939, 306 U.S. 79, 59 S.Ct. 438, 83 L.Ed. 500, is cited in support of the proposition that the granting of power to a federal agency does not render a nullity the action of a state agency until the federal agency acts in such a manner as to properly take the place of the action of the state agency. In the Welch case, however, the violation of the state law occurred after the effective date of the federal Act but before the Interstate Commerce Commission made its order.

In the case sub judice, the O.P.S., pursuant to the grant of power from Congress, promulgated the G.C.P.R. Between the time the Act was passed by Congress and the order was promulgated by the O.P.S., state agencies could, and did, retain control. During this period, the rule of the Welch case was applicable. On January 26, 1951, however, when the G.C.P.R. was promulgated, the O.P.S. established ceiling prices for all commodities. Section 11 of this regulation provides for parity adjustments and one of the agricultural commodities listed in Section 11(a) is milk. The regulation cites an example of how a processor of evaporated milk would compute a parity adjustment. The purpose of the regulation is stated in Section 1 as the establishment of "ceiling prices for all commodities and services (except those specifically exempt) upon the basis of prices in effect during the period from December 19, 1950, to January 25, 1951, inclusive [Emphasis added]." Since the court is of the opinion that the milk industry is not specifically exempt from price regulation, the order establishing ceiling prices for all commodities effectively established the ceiling price of milk. That O.P.S. intended to establish the ceiling price of milk when it issued the G.C.P.R. is clearly shown by Supplementary Regulation 16[12], effective April 6, 1951. SR 16 provided for the adjustment of ceiling prices in the milk industry but also declared that "this regulation does not constitute an over-all exemption of the price orders of state milk control agencies from the provisions of the General Ceiling Price Regulation, as amended." SR 16 is another indication that O.P.S. intended to control the milk industry when it issued the G.C.P.R. and established the ceiling prices for all commodities.

█ The intent of Congress to curb inflation is clear; the intent of the O.P.S. to carry out the mandate of Congress is clear. To read exemptions into the Defense Production Act of 1950 and the orders of O.P.S. promulgated thereunder, would simply hamper the authorities in the desperate battle against inflation. See Case v. Bowles, 327 U.S. 92, 99 (1946).

### Interpretation of Orders and Regulations

The Defense Production Act became law on September 8, 1950, but it was not until January 26, 1951, that strong inflationary pressures were countered with an across-the-board freeze of prices. The General Ceiling Price Regulation was issued on the latter date and prices were frozen at the maximum prices existing during the period from December 19, 1950, to January 25, 1951. Since the issuance of that general regulation, so-called tailored

12. SR 16 was revoked effective September 24, 1951. See footnote 21 infra.

102 F.Supp.—24

price ceiling regulations have been issued. Many regulations provided for price increases over the ceiling on the freeze date in order to maintain proper price relationships.

Any base period which may have been chosen was bound to find some prices distorted and to result in a certain amount of arbitrariness. For example, as proved in the instant case, 11 marketing areas in Pennsylvania out of 14 had received increased prices at the hands of the Milk Commission, but the base period arbitrarily froze the prices in the remaining 3 areas (Pittsburgh, Erie, Johnstown-Altoona) before the Commission was able to hold hearings for these areas and rectify the prices.

Prompted, no doubt, by the prospect of serious consequences unless the inequities were removed, Supplementary Regulation 16 was promulgated and Order No. L-1 was issued permitting, as of April 6, 1951, an increase of 1 cent per quart or 46.5 cents per cwt. in the price of standard milk in these areas. These measures were designed to remove the distortion and arbitrariness frozen into the milk price structure.[13]

This adjustment increasing the price 46.5 cents per cwt. (1 cent per quart), as implemented by the Commission's General Order A-396, gave the producer an increase of 35 cents per cwt. (.752+ of a cent per quart) and gave 11.5 cents per cwt. (.247+ of a cent per quart), the balance of the increase, to the defendant processors. It will be observed that the "processors' spread" of 11.5 cents per cwt. (.247+ of a cent per quart) is over and above the actual increase in the price paid to the producer. [14]

■ This adjustment, therefore ,was not a parity adjustment as provided for in G.C.P.R., Sec. 11 (See footnotes 6 & 8 supra).[15] The "processors' spread" over and above the exact price increase paid to the producer was to remedy the distortion caused by the general freeze.

It must be remembered that for the various reasons and considerations set forth in SR 16 and in Order No. L-1 the Director deliberately provided for, and enabled the defendant processors to obtain, this increased spread. Thus, on July 17, 1951, when the Commission again increased the producers' price 35 cents per cwt., the defendant processors were entitled by operation of a parity adjustment under G.C.P.R. Sec. 11 to increase the price of standard milk an additional 35 cents per cwt. or .752+ of a cent per quart.

In the meantime SR 20 became effective on April 18, 1951, and by its provisions the defendant processors claim to be entitled to a 1 cent increase in the selling price per quart because the increase per quart is in excess of .750 of a cent (see footnote 7).

The plaintiff contends that since the producers have received a total increase in price, since the base period, of 70 cents per cwt. or 1.505 cents per quart, the defendant processors under SR 20 are entitled only to that exact increase in price,

13. See G.C.P.R. Sec. 15 (16 F.R. 808, 815).

14. In Order No. L-1, O.P.S. had approved a 1 cent price increase to processors based upon a price increase to producers of 32 cents per cwt., thus providing an increased processors' spread of 14.5 cents per cwt. (.312+ of a cent per quart) to which the Commission was agreed. However, the Commission, by its Order effective April 16, 1951 (A-396), saw fit to grant a "processors' spread" of only 11.5 cents per cwt. (.247+ of a cent per quart).

15. The Statement of Considerations in G.C.P.R. "Parity Adjustment Provision," 16 F.R. 808, 811, provides:

"Those agricultural commodities which are under the legal minima have been exempted at the producer level. The prices at distributor levels have been frozen under the regulation, subject however to the provision that any increase in the price paid to the producer may be passed on, *in exact dollars and cents amounts*, through all subsequent stages of distribution.

"As for commodities processed from such agricultural commodities, any increase in the price of the agricultural commodity may be passed on by the processor *in the exact dollars and cents amount of his corresponding cost increase.* [Emphasis added]."

viz., 1.5 cents per quart (see footnotes 6, 7 and 15).

As cogently pointed out by the learned counsel for the defendants and amicus curiae, the latter interpretation would have the effect of denying to the defendant processors the "processors' spread" of 11.5 cents per cwt. or .247+ of a cent per quart which was deliberately awarded to them by the O.P.S. Order No. L–1; it would give them only the exact increase in price paid to the producer of 70 cents per cwt. or 1.5 cents per quart.

The court is of the opinion that the Government's interpretation would be inequitable and unjust because the April 6th adjustment under Order No. L–1 was intended by O.P.S. to give the defendant processors an increased spread in order to correct distortion or other inequity. In absence of an explicit O.P.S. order amending, modifying or revoking Order No. L–1, interpretations of the G.C.P.R., Section 11 (b), SR 20, or the denial order of July 23rd, cannot be employed to cancel it.

We need not go so far as to adopt defendants' interpretation of SR 20 to the effect that it is applicable only to increases due to parity adjustments; nor do we go so far as to adopt plaintiff's interpretation of SR 20 that it applies to all increases of whatsoever nature. We simply hold that no interpretation of this regulation can deprive the defendants of the "processors' spread" which O.P.S. deliberately awarded to them.

We agree with plaintiff's statement of policy that parity adjustments generally cannot be compounded, but we do not believe that such policy eliminates the corrective spread specifically granted under SR 16 pursuant to an effort to rectify the hardship caused by the freeze.

In view of the foregoing conclusion, it is not necessary to consider an additional contention advanced by defendants that their producers' costs are actually in excess of $6.05 per cwt. because the processing of milk inevitably results in some shrinkage. A finding favorable to them in this respect would only reinforce the conclusion already reached.[16]

If the plaintiff had not conceded that defendants were entitled to a parity adjustment by reason of the July 17th increase in the producers' prices, Section 11(f) [17] of the G.C.P.R. would have loomed large as a reason to retain the prices at 22 and 20 cents per quart. Admittedly, defendants made no effort to send a notice to O.P.S. by registered mail as required by that section for a parity adjustment. We apprehend, however, by the Government's concession, that the Commission's July petition for an increase, after denial by O.P.S. under SR 16 on July 23rd, can be treated as a notice of a parity adjustment under Section 11(f). The required data was certainly forwarded to O.P.S. and the requested increases were unquestionably made by the Commission on behalf of all the processors in the Pittsburgh, Erie and Johnstown-Altoona Areas.

The order issued by O.P.S. denying a 1 cent per quart increase under SR 16 left unclear just what O.P.S. then considered the processors' maximum prices to be. If it is assumed that O.P.S. was of the same opinion as that expressed by the Government in the complaint and attached affidavit, namely, that the processors were entitled to a parity adjustment of 1/2 cent per quart, O.P.S. had ample power and still has that power under Section 11(g) [18] of the G.C.P.R. to declare explicitly that the increase of 1 cent per quart imposed upon the processors by the Commission's Order A–

16. The diligent counsel for the Government has effectively demonstrated that a shrinkage of 10% would not affect the maximum prices as determined by the Government.

17. See footnote 8, supra.

18. "(g)·Effect of Notification of 'Parity' Adjustment. Upon mailing the notification required in paragraph (f) above, you may charge the new ceiling price. If, in the judgment of the Director of Price Stabilization, the increase is deemed unreasonable, excessive or otherwise improper, he may disapprove the price and restore the old ceiling price or establish a new ceiling price and may apply it retroactively."

415, considered as a parity adjustment, is "unreasonable, excessive or otherwise improper," and that the maximum prices should be 22-1/2 cents per quart retail and 20-1/2 cents per quart wholesale. Likewise, O.P.S. had the power under SR 16 and seemingly has the power under its successor regulation SR 63 to fix maximum prices by definitive order, which, after notice to the processors, would be binding upon them. It is the court's opinion under all the circumstances of this case that, after proper investigation, a definitive order by O.P.S. would be appropriate.

The fact that the Commission's Order A–415 happened to raise the price of milk in the exact amount permitted by the court's interpretation of the O.P.S. regulations is in no way to be construed as an approval of the Commission's Order. The rationale justifying the last increase of 1 cent per quart is not the Commission's Order but the court's interpretation. Let there be no misunderstanding that if this court were to find a violation of the ceiling prices as established or proclaimed by O.P.S. it would be promptly enjoined, notwithstanding the minimum price provisions of the Commission.[19] Case v. Bowles, 1946, 327 U.S. 92, 66 S.Ct. 438, 90 L.Ed. 552; Bowles v. Bergman,[20] et al., D.C.N.D.N.Y. 1944, Civil Action No. 1546. See also Hecht Co. v. Bowles, 1944, 321 U.S. 321, 331, 64 S.Ct. 587, 88 L.Ed. 754.

### Conclusions of Law

1. Jurisdiction of this action is conferred upon this court by Sections 409(a) and 706(b) of the Defense Production Act of 1950, Act of Sept. 8, 1950, c. 932, 64 Stat. 811(a), 817(b); 50 U.S.C.A.Appendix, §§ 2109(a) and 2156(b), as amended by Defense Production Act Amendments of 1951, c. 275, Public Law 96, 82nd Cong., 1st Sess.

2. During the base period fixed by the G.C.P.R. selling prices for milk in the Pittsburgh Area were 21 cents per quart retail and 19 cents per quart wholesale, which prices became the base period ceiling prices for the defendant processors, and their maximum prices during the period from January 26, 1951 to April 6, 1951.

3. Following the adjustment of the ceiling prices granted by O.P.S. effective April 6, 1951, the defendant processors' maximum prices became 22 cents per quart retail and 20 cents per quart wholesale. This adjustment was not a parity adjustment under the G.C.P.R., Section 11, but was an adjustment of the ceiling prices under SR 16 (16 F.R. 3011) [21] granted by O.P.S. by Order No. L–1. No process of rounding of fractions was used in determining this adjustment of ceiling prices.

4. Since the Commission, by General Order No. A–415 effective July 17, 1951, had advanced the producers' price from $5.70 per cwt. to $6.05 per cwt., and since said increased price was below parity, it was lawful for defendant processors, under the G.C.P.R., Section 11(b) (2) and by employing the process of rounding of fractions under SR 20 (16 F.R. 3436), to increase their maximum prices 1 cent per quart as parity adjustments and to sell milk at 23 cents per quart retail and 21 cents per quart wholesale.

5. Interpretations of regulations should not be adopted which would deprive defendant processors of the "processors' spread" of 11-1/2 cents per cwt. (.247+ of a cent per quart) which spread, upon consideration of various factors prescribed by SR 16, was deliberately granted to them by O.P.S. by Order No. L–1 issued April 6, 1951, and which Order is presently in full force and effect.

6. The Defense Production Act of 1950 and the orders and regulations of the O.P.

---

19. See the Defense Production Act of 1950, Sept. 8, 1950, c. 932, Title VII, Sec. 702, 64 Stat. 815, 50 U.S.C.A.Appendix, § 2152, which provides that as used in the Act: "(a) The word 'person' includes * * * the United States or any agency thereof, or any other government, or any of its political subdivi-

sions, or any agency of any of the foregoing: * * *."

20. No opinion for publication.

21. SR 16 was revoked by SR 63 (16 F.R. 9559) effective September 24, 1951; however, SR 63 provides that all orders previously issued under SR 16 shall remain in effect until superseded.

S. issued thereunder are paramount to the Pennsylvania Milk Control Law and the orders and regulations of the Commission. The letter of the Director of O.P.S. under date of July 23, 1951, was, under SR 16, a lawful denial of the petition of the Commission for increased ceiling prices for fluid milk and milk products, and any of the minimum prices fixed by the Commission in its General Order A-415, except producers' prices, which are in excess of the maximum ceiling prices established pursuant to the orders and regulations of O.P.S. would be suspended and should be enjoined.

7. The plaintiff has not proved that the defendant processors are selling milk or milk products in excess of the maximum price regulations established by O.P.S.

8. The complaint should be dismissed.