

# THE ATTORNEY GENERAL
# OF TEXAS

CRAWFORD C. MARTIN
ATTORNEY GENERAL

AUSTIN, TEXAS 78711

August 24, 1971

Honorable Robert S. Calvert
Comptroller of Public Accounts
State Finance Building
Austin, Texas

Opinion No. M-942

Re: Applicability of recent
Presidential Executive
Order providing for
stabilization of prices,
salaries, etc., to the
State of Texas, and re-
lated questions.

Dear Mr. Calvert:

This will acknowledge your letter of August 20, 1971, in which you requested the opinion of this office on the following questions:

"1. Is President Richard Nixon's Executive Order providing for stabilization of prices, rents, wages and salaries applicable to the State of Texas?

"2. Does Governor Preston Smith's Proclamation of August 19, 1971, have any effect?

"3. Is the Comptroller of Public Accounts authorized to pay salaries at sums less than those provided for in Senate Bill 11, Acts of the 62nd Legislature, Regular Session, 1971, and House Bill 279, Acts of the 62nd Legislature, Regular Session, 1971. Stated another way, does the law authorize him to conform to the Presidential Proclamation?"

The first question is whether the President's Proclamation freezing wages and prices applies to the state.

Section 1 of the Proclamation states:

-4600-

"Prices, rents, wages, and salaries shall be stabilized for a period of ninety (90) days from the date hereof at levels not greater than the highest of those pertaining to a substantial volume of actual transactions by each individual, business, firm and other entity of any kind during the thirty day period ending August 14, 1971 . . ."

In determining the intent of the President, we must examine the language quoted above which states ". . . or other entity of any kind." The authorities clearly indicate that this language is broad enough to cover the state.

In Case v. Bowles, 327 U.S. 92, 66 S. Ct. 438, 90 L.Ed. 552, (1946), the State of Washington became involved with the federal government over whether the Emergency Price Control Act applied to the state's selling of timber to various individuals pursuant to state law. The State of Washington took the position that because the word "State" was not mentioned in the Emergency Price Control Act that Congress did not intend for this Act to apply to the states. However, the Supreme Court held that just because Congress does not use the word "State" in any Act does not mean conclusively that the Act does not apply to a state or the states. The court found language in the Emergency Price Control Act similar to the above quoted language of the President's Proclamation and stated that that language was broad enough to cover states and the court also observed that to hold otherwise would frustrate the obvious intent of Congress to control inflation under the Emergency Price Control Act if the states were not covered by such Act.

In addition to Case v. Bowles, supra, there is a companion case styled Hulburt v. Twin Falls County, Idaho, 327 U.S. 103, 66 S.Ct. 444, 90 L.Ed. 560 (1946), which holds that the Emergency Price Control Act applies to a county. The Supreme Court in this latter decision applied the same rationale as found in the Case v. Bowles decision.

There is one decision which seems somewhat in conflict with the above stated decisions. It is the case of Penn Dairies vs. The Milk Control Commission, 318 U.S. 261, 63 S.Ct. 617, 87 L.Ed. 748 (1943). In this case the Supreme Court stated

a rule that in the absence of an express intent by Congress
to set aside a statute of the state regulating the internal
affairs, the court would not lightly infer or imply such
intent where the act is ambiguous.

In the Penn Dairies case the Supreme Court refused to
apply a federal statute to resolve an alleged conflict between
the federal statute and a state law on the basis the federal
statute did not expressly use the term "State" and consequently
the Supreme Court found no supremacy clause problems.  However,
in a more recent decision, California v. Taylor, 353 U.S. 553,
77 S.Ct. 1037, 1 L.Ed.2d 1034 (1956), the Supreme Court held
that an act of Congress, which dealt with regulations under
the Interstate Commerce Clause of all public railroads,
that a railroad owned by the State of California was subject
to the congressional act in spite of the fact congressional
act did not use the term "State" in the Act.  The court stated
in essence where the aim of an act can fairly be inferred to
apply to a state, then such aim cannot be disregarded for lack
of specific language.

Also, it should be pointed out that a 1963 decision by
the Supreme Court styled Paul vs. U.S., 371 U.S. 271, 83
S.Ct. 426, 9 L.Ed.2d 292 (1963) cast a serious cloud over
the viability of the Penn Dairies case.  The dissent in Paul
vs. U.S. indicates that the majority opinion in the Paul case,
in effect, overrules the Penn Dairies case on the question of
whether a federal act covered the state and therefore was
in conflict with the state act and the state act had to fall
under the supremacy clause.

We have before us at this time a Presidential Order based
upon an Act of Congress which provides "the President is
authorized to issue such order and regulations as he may
deem appropriate to stabilize prices, rents, wages, and
salaries . . ." and the Act further provides "whenever it ap-
pears . . . that any person has engaged . . ."  In our opinion,
based upon an analysis of the above discussed decisions, the
Executive Order is applicable to the State of Texas and all
other states.

Any state law, however, clearly within state acknowledged
power, which interferes with or is contrary to a valid federal

law must yield to the federal law to the extent of the con-flict. <u>Continental Radio Co. v. Continental Bank & Trust Co.</u>, 369 S.W.2d 359 (Tex.Civ.App. 1963, error ref., n.r.e.); <u>Free v. Bland,</u> 369 U.S. 663 (1962, revg. 344 S.W.2d 435, Tex. Sup., 1961, and conformed to 359 S.W.2d 27).

The principle is well established that

> ". . . where Congress has authorized a public officer to take some specified legislative action when in his judgment that action is necessary or appropriate to carry out the policy of Congress, the judgment of the officer as to the existence of the facts calling for that action is not subject to review . . . " <u>U.S. v. Bush</u>, 310 U.S. 371 (1940).

In this <u>Bush</u> case, the President of the United States acted, as authorized under Act of Congress, by Proclamation to increase the duty and changes in classification of certain foreign imports.  In the earlier case of <u>Dakota Cent. Telephone Co. v. State of South Dakota</u>, 250 U.S. 163 (1919) the very broad powers of the President to take possession and control of telegraph, telephone, and other communication companies, and operate them, by Proclamation, under authorization of Congress and his wartime powers, was upheld.  An Executive Order of the President

> ". . . is to be accorded the force and effect given to a statute enacted by Congress . . ."
> <u>Farkas v. Texas Instrument, Inc.</u>, 375 F.2d 629 (5th Cir. 1967, cert. den. 389 U.S. 977)

The power of the President to act by the Executive Order under consideration is fully sustained by the authorities cited in support of the text in the text book entitled <u>Modern Constitutional Law</u>, by Chester J. Antieau, Volume II, Section 11:21 at pages 222-231, and Sections 13:22 through 13:25 at pages 526-531.

> ". . . the clearest demonstration of arbitrariness is required to justify a court in striking down a proclamation of the President." 16 C.J.S., 437 Constitutional Law, Sec. 99, citing <u>Beal v. U.S.</u>, C.A. Ky. 182 F.2d 565, cer. den. 71 S.Ct. 81, 340

U.S. 852, 95 L.Ed. 625.

We conclude that the Executive Order is a valid exercise of executive power pursuant to express congressional authorization.

The next question for consideration is what effect the Governor's Proclamation of August 19, 1971, has upon the payment of wages and salaries to State officials, State employees and teachers in the public schools of this State, pursuant to the provisions of Senate Bill 11, Acts of the 62nd Legislature, Regulat Session, 1971, as amended, and House Bill 279, Acts of the 62nd Legislature, Regular Session, 1971.  At this point, the terms of the Governor's Proclamation of August 19, 1971, should be examined, and they are set forth as follows:

> "I do hereby proclaim that the State of Texas will abide by the laws of the State of Texas and will put into effect on September 1, 1971, the provisions of Senate Bill 11, Acts of the 62nd Legislature, Regular Session, as amended, and House Bill 279, Acts of the 62nd Legislature, Regular Session.

> "By this proclamation, I am hereby instructing all State agency heads to comply with Senate Bill 11 and House Bill 279.  In complying with this proclamation, no State agency head shall be liable for obeying these provisions of state law.  As Governor of the State of Texas, I accept full responsibility for the actions taken by all state agency heads pursuant to this proclamation."

The foregoing provisions of the Governor's Proclamation of August 19, 1971, merely instruct the heads of all state agencies to put into effect and comply with the provisions of Senate Bill 11, The General Appropriations Bill, and House Bill 279, which sets forth certain salary increases for the teachers of the public schools.  Such Proclamation does not specifically instruct the heads of the various State agencies to ignore or defy the Presidential Executive Order freezing wages and salaries.

While the Governor's Proclamation does not specifically set forth that Senate Bill 11 and House Bill 279 are to be put into effect in a manner in conflict with the Presidential Executive Order, the following comments will be based upon the assumption that the intent of the Governor's Proclamation was for the various heads of State agencies to disregard the Presidential Executive Order in the payment of wages and salaries pursuant to Senate Bill 11 and House Bill 279.

Section 1 of Article IV of the Constitution of Texas provides that:

"The Executive Department of the State shall consist of a Governor, who shall be the Chief Executive Officer of the State, a Lieutenant Governor, Secretary of State, Comptroller of Public Accounts, Treasurer, Commissioner of the General Land Office, and Attorney General."

Section 10 of Article IV of the Constitution of Texas provides:

"He (the Governor) shall cause the laws to be faithfully executed and shall conduct, in person, or in such manner as shall be prescribed by law, all intercourse and business of the State, with the other States and with the United States."

Of significance is the interpretative commentary following Section 10 of Article IV which provides:

"The obligation placed by this section upon the governor to cause the laws to be faithfully executed is, obviously, executive in nature. But this obligation, and the fact that the governor is made the chief executive officer of the state, do not confer upon him any specific power. In construing state constitutions, the state courts have not derived, as has the Supreme Court of the United States with respect to the Federal Executive, any very large power from such a general power or duty as to the duty to see that the laws be

faithfully executed. The rule of delegated powers has been construed strictly as to the governor, so that he has no particular power unless granted to him, expressly or impliedly.

"Moreover, this responsibility placed upon him for law enforcement in Texas is more fiction than reality, for the constitution gives the governor little power to see that the laws are enforced. Other than the power to declare martial law and the use of the militia and Texas Rangers, little or no means of carrying out this responsibility is provided. Apparently, as has been stated, this section confers upon the governor only the duty to give direction to the management of affairs in all the branches of the executive department. See Houston Tap & Brazoria R. Co. v. Randolph, 24 T. 317 (1859)."

The case of Houston Tap & Brazoria R. Co. v. Randolph, 24 T. 317 (1859) referred to contains an informative comment by the court upon the relationship between the Governor and the other agencies and officers comprising the Executive Department of the State of Texas, and such comments are set forth as follows:

". . . He (the governor) is the head of the Executive Department of the State, and it is made his duty, by the Constitution, to 'take care that the laws be faithfully executed'. It is evidently contemplated, that he shall give direction to the management of affairs, in all the branches of the Executive Department. Otherwise he has very little to do. Where he has the power of removal, he can assume authoritative control absolutely in all of the departments. This being the case in the United States government, results in the entire unity of its Executive Department. The absence of that absolute power of the chief executive in this State must occasionally produce a want of harmony in the executive administration, by the inferior offices of that administration, declining to comply with the wishes, or to follow the judgment of the

governor. That is an inherent difficulty in the
organization of that department, and the conflicts
arising out of it, cannot be adjudicated or settled
by the judiciary. The fact that there is no remedy
for an injury growing out of such conflict, cannot
justify another department, to wit, the judiciary,
in overstepping the boundary of its prescribed
authority for the purpose of furnishing a remedy.
The other department, the legislative, may be able to
furnish a remedy. The judiciary act on passed facts.
The Legislature acts by devising for the future . . ."
(Emphasis added.)

In the case of Williams v. State, 176 S.W.2d 177 Ct. of
Crim.App. 1943, the court had certain questions before it
dealing with a proclamation of the governor and the court's
comments in connection with these issues is set forth as
follows:

"Does the Act provide for reasonable notice
of the Governor's proclamation putting into effect
the recommendation of the Commission?

"As to this, the record reflects that the
Governor's proclamation was duly and regularly
filed by the Governor, in the office of the
Secretary of State long prior to the year 1942, and
that appellant's land was in the regulated zone
therein set out. A proclamation of the Chief
Executive of this State, when duly promulgated and
filed, occupies a position comparable to laws
regularly passed by the Legislature. That a
proclamation by the Governor, of and within itself,
is notice is further manifested by the fact that
the courts are required to take, and do take,
judicial notice of the contents thereof . . ."
(Emphasis added.)

While the foregoing case dealt merely with whether the
Governor's Proclamation constituted sufficient notice, the
language therein might tend to indicate that such proclama-
tions are similar in effect to a legislative enactment.
However, in the case of Terrell Wells Swimming Pool v.
Rodriguez, 182 S.W.2d 824 (Tex.Civ.App. 1944, error ref.),

the court stated in connection with a proclamation by the Governor that:

> "With reference to the proclamation issued by the Governor on June 25, 1943, it is sufficient to say that the Governor of this State, even in time of war, <u>is without power to change the existing law merely by the issuance of a proclamation</u>, and we attribute no such intention to the Governor." (Emphasis added.)

Also, at this point the case of <u>Sterling v. Constantin</u>, 287 U.S. 378, 53 S.Ct. 190, 77 L.Ed. 375 (1932), gives us a most enlightening example of the results of an Executive Order or Proclamation of the Governor of a state conflicting with action by the federal government. This case dealt with the State of Texas, and the comments of the court are set forth as follows:

> ". . .The question before us is simply with respect to the Governor's attempt to regulate by executive order the lawful use of complainant's properties in the production of oil. Instead of affording them protection in the lawful exercise of their rights as determined by the courts, he sought, by his executive orders, to make that exercise impossible. In the place of judicial procedure, available in the courts which were open and functioning, he set up his executive commands which brooked neither delay or appeal, in particular, to the process of the federal court actually and properly engaged in examining and protecting an asserted federal right, the Governor interposed the obstruction of his will, subverting the federal authority.

> ". . .

> ". . . There was no exigency which justified the Governor in attempting to enforce by executive or military order the restriction which the District Judge had restrained pending proper judicial

-4608-

authority.  If it be assumed that the Governor was
entitled to declare a state of insurrection and to
bring military force to the aid of civil authority,
the proper use of that power in this instance was
to maintain the federal court in the exercise of
its jurisdiction and not attempt to override it;
to aid in making its process effective and not to
nullify it; to remove, and not to create, obstructions
to the exercise by the complainants of their rights
as judicially declared . . ."

In view of the foregoing authorities, we are of the opinion
that the Proclamation of the Governor issued on August 19,
1971, is merely directive to the various heads of the State
agencies and not a mandatory requirement upon them.  In
addition, we are of the further opinion that the Governor's
Proclamation of August 19, 1971, does not have the effect of
altering or amending existing State or Federal statutes or
Executive Orders.  Therefore, the Governor's Proclamation
does not repeal, modify or change the Presidential Executive
Order in any respect.

It is well settled that an appropriation bill sets apart
from the public revenue sums of monies for specific objects
authorizing the executive officers of the State to use that
money in the amount, manner, and purpose of the various
items of expenditures and therefore a general appropriation
bill may contain any provisions or riders which detail, limit
or restrict the use of funds or otherwise insure that the money
is spent for the required activities of the State for which it
is therein appropriated.  Attorney General's Opinions 2965
(1935) and V-1254 (1951) and authorities cited therein.  It
has been held that a general appropriation bill cannot repeal,
modify or amend an existing general law.  State v. Steele,
57 Tex. 203 (1882); Linden v. Finley, 92 Tex. 451, 49 S.W.
578 (1889); Moore v. Sheppard, 144 Tex. 537, 192 S.W.2d 559
(1946).  In each of these cases, however, the invalidity of
the particular rider in question did not affect the remaining
authorization for the expenditure of public monies and the
stipulation of the amount, manner, and purpose of the various
items of expenditures.  The Executive Order of the President
constitutes a portion of the pre-existing law controlling the
Appropriation Bills.

Following the reasoning of the numerous cases construing appropriation bills throughout the history of this State, it is our opinion that the Executive Order of President Nixon will affect only the maximum amount of salary authorized to be paid in Senate Bill 11, Acts 62nd Legislature, Regular Session, 1971, and House Bill 279, Acts 62nd Legislature, Regular Session, 1971, and does not in any manner affect the remaining authorizations for expenditure of public monies for the purposes set out in the Appropriation Bills.

You are accordingly advised that the Comptroller of Public Accounts is authorized to pay salaries at sums less than those provided in the Appropriation Bills in those instances required by the President's Executive Order and is required to take such other necessary steps as may be deemed appropriate to conform to the Presidential Proclamation.

### S U M M A R Y

President Nixon's recent Executive Order providing for stabilization of prices, rents, wages and salaries is valid and applicable to the State of Texas.

Governor Smith's Proclamation of August 19, 1971, does not repeal, modify or affect said Executive Order.

The law requires the Comptroller of Public Accounts of the State of Texas to conform to said Presidential Executive Order.

Very truly yours,

CRAWFORD C. MARTIN
Attorney General of Texas

Prepared by J. C. Davis
Assistant Attorney General

APPROVED:
OPINION COMMITTEE

Kerns Taylor, Chairman
W. E. Allen, Co-Chairman
Pat Bailey
John Reeves
James McCoy
Pat Cain

ALFRED WALKER
Executive Assistant

NOLA WHITE
First Assistant